# Exhibit 55

# (electronic document, could not be uploaded)

# Exhibit 56

THE CARREON FIRM
Patrick Carreon, Esq. State Bar No. 119576
444 W. Ocean Blvd., Suite 505
Telephone: (562) 432-9999
Fax: (562) 432-9990
carreon@mocalaw.com

*A 6031*
*90026*

Attorneys for Plaintiff
SURGICAL PROGRAM DEVELOPMENT, LLC

*D 24   Hess*

FILED
Superior Court Of California
County Of Los Angeles

AUG 24 2017

Sherri R. Carter, Executive Officer/Clerk
By _____ Deputy
Charlie L. Coleman

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

| | |
|---|---|
| SURGICAL PROGRAM DEVELOPMENT, LLC, a California Limited Liability Company | Case No. **BC 6 7 3 6 5 6** <br> Unlimited Civil Action |
| Plaintiff, | **PLAINTIFF'S COMPLAINT FOR:** |
| Vs. | **(1) INTENTIONAL TORTIOUS INTERFERENCE WITH CONTRACT;** |
| SUCCESS HEALTHCARE 1, LLC, a California Limited Liability Company dba SILVER LAKE MEDICAL CENTER; PROMISE HEALTHCARE INC., a Florida Corporation; JAMES HOPWOOD, an individual; DAVID ARMSTRONG, an individual; BRENT COPE, an individual; GEORGE WATKINS; an individual and DOES 1 through 100, inclusive, | **(2) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** <br> **(3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** <br> **(4) BREACH OF CONTRACT** |
| Defendants, | **DEMAND FOR JURY TRIAL** |

CIT./CASE: BC673656
LEA/DEF#:
RECEIPT #: CCH24111042
DATE PAID: 08/24/17
PAYMENT: $435.00
RECEIVED: 10:54 AM
  310
CHECK:          $435.00
CASH:           $0.00
CHANGE:         $0.00
CARD:           $0.00

COMES NOW, Plaintiff, SURGICAL PROGRAM DEVELOPMENT, LLC and brings the

following claims and causes of action against Defendants and each of them as follows:

08/24/2017

---

PLAINTIFF'S COMPLAINT FOR DAMAGES

# **GENERAL ALLEGATIONS**

1.     Plaintiff SURGICAL PROGRAM DEVELOPMENT, LLC (hereinafter referred to as "SPD") is a company with an expertise in managing surgical programs within hospitals and other surgical care facilities.  Their services focus upon educating hospitals and surgical centers on how to build legally compliant and profitable surgical specialty programs and then managing said programs so as to create a sustainable working relationship between the facility, the physicians working within the program and the patients who receive treatment.

2.     In June 2010, plaintiff entered into a contract with SUCCESS HEALTHCARE 1, LLC (hereinafter referred to as "Success Corporation"), a California corporation doing business as SILVER LAKE MEDICAL CENTER.  Plaintiff was to assist Success Corporation's hospital (hereinafter referred to as "Silver Lake") in initiating, building and managing a substantial and sustainable surgical program; to include all aspects of orthopedic care with an emphasis on the spine, to recruit surgeons, to develop policies, to collect reimbursement from payors for the healthcare services provided and to keep said program compliant with state and federal law.

3.     Plaintiff's contract with the hospital proved to be successful at building a surgical program and profits for both plaintiff and the hospital. Over the course of time, however, defendants made the determination that they wished to increase their profitability under the contract to the detriment of plaintiff.  Defendants approached plaintiff demanding that they be allowed to take on the responsibility of paying for implantable hardware (these expensive items include braces, screws, posts, etc. and are generally used in spine surgeries).  Plaintiff did not wish to relinquish this responsibility, but given the insistence of defendants, plaintiff allowed this to occur.  Plaintiff is informed and believes that during this time, defendants made the decision to engage in corporate malfeasance.  Unbeknownst to plaintiff, it was during this time that defendants, through their mismanagement, created a debt in excess of $1 million for themselves.

- 2 -

PLAINTIFF'S COMPLAINT FOR DAMAGES

Subsequently, after approximately twenty months Defendants unilaterally made the decision to transfer the hardware responsibilities back plaintiff.

4.      In or around 2014, defendants made the decision to refinance the hospital. In order to present the hospital as a more profitable entity to lending institutions, defendants strategically decided to engage in additional corporate malfeasance. As a "cost saving measure" defendants chose not to pay select vendors until refinancing or a credit line from a major bank had been secured. The vendors who provided hardware for spine surgeries submitted expensive bills. Although defendants were obligated to pay these bills, they decided not to reimburse the vendors. Over the course of time, not paying these vendors allowed defendants to present hundreds of thousands of additional dollars to banking entities as "net revenue," thus allowing defendants to falsely present a more robust financial picture of their company. Internally, defendants carried such debts as plaintiff's obligation, even though defendants were responsible for them. Allegedly, this inaccurate internal accounting was supposed to be corrected once the loan/refinancing was secured. However, after securing their financing, defendants decided that it was better for their business to blame plaintiff for their debt. Thus, defendants made a formal demand that plaintiff reimburse the debt as if plaintiff actually owed it.

5.      Additional "cost saving measures" implemented by defendants included their decision to interrupt the flow of compensation to plaintiff by withholding checks and further interfering with plaintiff's surgical program by failing to properly maintain the support staff, supplies, tools and, most importantly, the temperature controls of the hospital. The temperature control issue, which raised the risks of infection for all surgeries, resulted in surgeons withdrawing from plaintiff's program. Defendants' actions and inactions caused plaintiff's business model and surgical program to implode. In addition, as word got out to the medical community as to the program's failures, plaintiff's reputation as a manager of such surgical programs was tarnished.

PLAINTIFF'S COMPLAINT FOR DAMAGES

1  This has affected plaintiff's ability to start up surgical programs with other hospitals as well as its

2  ability to attract physicians to its other surgical programs currently in place. Ultimately,

3  defendants' actions have caused damage to plaintiff's business prospects as a whole in excess of

4  $2 million dollars a year.  It is on this basis that plaintiff brings the foregoing complaint seeking

5  contractual, general, loss of prospective business and punitive damages against defendants and

6  each of them.

7

8                                              **THE FACTS**

9

10         6.       Plaintiff SPD is a company with expertise in facility management, surgical program

11  consulting, revenue cycle management, payor contract management and regulatory compliance.

12  Hospitals and surgical centers have encountered almost insurmountable challenges in dealing with

13  their own orthopedic and spine surgery programs. Millions of dollars are lost if not to poor case

14  management and/or program management, then to the costs and legal fees incurred when a

15  program operates in a manner that ends up violating federal or state regulations. The role of

16  plaintiff SPD is to build cost-effective, legally compliant surgical specialty programs within

17  hospitals and surgical centers that wish to employ such programs.

18

19         7.       As referenced above, defendant SUCCESS HEALTHCARE 1, LLC, is a

20  California corporation based in Los Angeles, California. SILVER LAKE MEDICAL CENTER is

21  an acute hospital located in Los Angeles, California.  Plaintiff is informed and believes that

22  defendant Success Corporation operated and managed Silver Lake.  The contract which makes up

23  the subject matter of this action was entered into by plaintiff in Los Angeles, California.

24

25         8.       Plaintiff is informed and believes that defendant BRENT COPE (hereinafter

26  referred to as "Cope"), was at all relevant times herein, a California resident serving as an officer

27  or director of defendant Success Corporation.

28         9.       Plaintiff is informed and believes that defendant GEORGE WATKINS (hereinafter

- 4 -

PLAINTIFF'S COMPLAINT FOR DAMAGES

referred to as "Watkins"), was at all times relevant herein, a California resident serving as an officer or director of defendant Success Corporation.

10.     Defendant PROMISE HEALTHCARE, INC. (hereinafter referred to as "Promise Corporation"), is a Florida based corporation and advertises itself as one of the largest acute care hospital organizations in the country with more than 5000 staff members nationwide.

11.     Plaintiff is informed and believes that defendant JAMES HOPWOOD (hereinafter referred to as "Hopwood") is a Florida resident and at all times relevant herein, was serving as an officer or director of defendant Promise Corporation.

12.     Plaintiff is informed and believes that defendant DAVID ARMSTRONG (hereinafter referred to as "Armstrong"), is a Florida resident and at all times relevant herein, was serving as an officer or director of defendant Promise Corporation.

13.     The true names and/or capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 100, inclusive, and each of them, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes, and on such information and belief alleges, that each of the Defendants fictitiously named herein as a DOE is legally responsible in some actionable manner, for the events and happenings hereinafter referred to and proximately caused the injuries and damages to Plaintiff as hereinafter alleged. Plaintiff will seek leave of Court to amend this Complaint to insert the true names and/or capacities of such fictitiously named Defendants when the same have been ascertained.

14.     Plaintiff is informed and believes that at all relevant times herein that defendant Success Corporation, located in Los Angeles, California was a subsidiary of parent, defendant Promise Corporation, located in Florida. Both Success Corporation and Promise Corporation had their own chief executive officers, chief operating officers, chief financial officers and relevant

- 5 -

1  staff.

2      15.    As referenced above, in June 2010, in Los Angeles, California, plaintiff SPD and

3  defendant Success Corporation entered into a contract wherein plaintiff was to assist Silver Lake

4  Hospital in developing a sustainable surgical program. At that time, Silver Lake had a negligible

5  surgical program but was desirous of building one with the assistance of plaintiff. The contract

6  was amended on several occasions thereafter as the duties of plaintiff evolved.

7

8      16.    Ultimately it was agreed that plaintiff would provide defendant Success

9  Corporation and Silver Lake Hospital with management services relating to the hospital spine

10  surgery program. Such services would include, but not be limited to, maintaining good

11  relationships between the hospital and the physicians participating in the program; facilitating the

12  resolution of issues that may arise between the hospital and physicians; developing relationships

13  with qualified physicians to participate in the program; facilitating physician application processes

14  to become a member of the hospital medical staff; consulting and advising the hospital and

15  defendant Success Corporation with regards to payor plans; arranging for the prequalification of

16  patients and the preauthorization of surgeries; and providing other advice and recommendations

17  concerning the conduct of the hospital's spine surgery program.

18      17.    In addition, plaintiff was to serve as the exclusive provider of collection services

19  with respect to all claims for inpatient procedures and related supplies arising from surgical

20  procedures performed by physicians. In fact, it was expressly agreed as one of the "Hospital's

21  Duties" that prior to entering into any agreements or other financial relationships with any new

22  vendors relating to spinal surgeries, the hospital would give plaintiff 30 days written notice of

23  such proposed relationship. This provision was imperative since its purpose was to allow plaintiff

24  time to investigate and review such vendors, any agreements and any such financial relationship

25  for issues such as regulatory compliance, the vendor's reputation and relationships with other

26

27

28

PLAINTIFF'S COMPLAINT FOR DAMAGES

hospitals and to advise defendant Success Corporation and the hospital with regards to the same.

18. As stated above, initially, Plaintiff's contract with the Success Corporation proved to be advantageous for both plaintiff and the hospital. The hospital's surgical program began to develop. As the program grew, both plaintiff and defendants profited from the arrangement. Over the course of time, however, defendants made the determination that they wished to increase their profitability under the contract to the detriment of plaintiff. In December 2013, Defendant Success Corporation, through defendant's Cope and Watkins demanded that they be allowed to take over several important responsibilities that were being handled by plaintiff. These responsibilities included the purchasing of relevant hardware (rods, screws, cages, etc.) to be used by surgeons and implanted during the course of spinal surgeries. Plaintiff had consistently bargained with hardware manufacturers and distributors to make sure that the lowest price was paid for the best products. In light of the hospital taking over the responsibility for hardware, defendants asserted that plaintiff's compensation pursuant to their contract should be reduced.

19. Plaintiff is informed and believes that in 2014 defendants made the decision to refinance the hospital. Defendants were motivated to present the facility's profitability in the most advantageous way possible to banks and other lenders for the purpose of securing refinancing and/or a significant line of credit. Implantable hardware is very expensive. Defendants, in taking over the hardware portion of plaintiff's surgical program made the decision that it would bill for the hardware supplied by vendors for surgery, but when payment came they would not reimburse the vendors. In adding these unpaid costs to the additional money retained from the reduction in plaintiff payments, defendants were able to represent to banks and other lenders a falsified, but more advantageous-looking profit margin for the facility. In a further attempt to hide their costs, defendants planned, internally, to carry the debts they created as plaintiff's obligation on its books until the loan/financing was secured.

PLAINTIFF'S COMPLAINT FOR DAMAGES

20.    In addition, during 2013 and 2014, defendants Success Corporation, Cope and Watkins, unbeknownst to plaintiff, breached their contract with plaintiff by failing to provide notice, written or otherwise, that they had entered into agreements and other financial relationships with other vendors, management agencies and physicians in relation to spine surgeries. Thus, plaintiff was unable to review said agreements and financial relationships as to how they affected the surgical program and/or whether they were complying with the law. During this time, mismanagement on the part of defendants Success Corporation, Cope and Watkins resulted in a Success Corporation debt in excess of $1 million. However, as referenced above, said debt was hidden and presented as an amount owed by plaintiff in order to show additional profits to the hospital that, in fact, did not exist. Additionally, it has been brought to the attention of plaintiff that several nefarious and illegal relationships may have been created when defendants were managing the hardware portion of plaintiff's surgical program. Plaintiff reserves the right to amend this complaint to state those facts once said facts are known.

21.    Subsequently, Defendants made the decision to transfer the hardware responsibilities back plaintiff. As plaintiff slowly re-implemented the hardware responsibilities back within its program, in approximately May 2016, plaintiff began to learn of the approximate $1 million discrepancy in the surgical program's accounting and the fact that hardware vendors had not been paid by defendants for their products. Defendants Success Corporation, Cope and Watkins consistently represented to plaintiff that the "debt issue" was an internal one and would be resolved. Over time, however, the "debt issue" was not resolved. In fact, in December 2016, in order to protect the viability and reputation of its surgical program at Silver Lake Hospital, plaintiff had to negotiate with one such vendor and provided a partial payment of its own money (approximately $200,000) to eventually bring about a settlement and prevent a $1 million lawsuit from being filed against the hospital and plaintiff's program.

- 8 -

22.     To add insult to injury, over the first half of 2017, plaintiff learned for the first time that despite the past representations of defendants Success Corporation, Cope and Watkins, where they had informed plaintiff that the $1 million accounts receivable issue was an internal one that would be resolved, said defendants, in truth, for over a year and one half, had intentionally and wrongfully misrepresented to defendants Promise Corporation, that said debt had been created and was owed by plaintiff to defendant Success Corporation. In early June 2017, plaintiff demanded arbitration in regards to this issue pursuant to its contract with Success Corporation. Days later, defendants Promise Corporation, through defendant Hopwood, met personally with plaintiff representatives and informed plaintiff in no uncertain terms that arbitration would not go forward; that plaintiffs' concerns in regards to the hardware management and accounts receivable would be addressed; that plaintiff's contract responsibilities and compensation would be clarified through a new amendment to said contract and that "other issues" would also be dealt with.

23.     The "other issues" referenced above concerned the failure on the part of defendants to maintain adequate conditions at Silver Lake Hospital in order to allow spine surgeries to be safely performed there. Since mid 2014, defendants Success Corporation, Cope and Watkins had been expressly informed by plaintiff that defendants' failure to properly maintain Silver Lake hospital was negatively impacting plaintiff's surgical program and endangering patients. Plaintiffs are informed and believe that defendants Promise Corporation, Hopwood and Armstrong also knew of this problem at this time.

24.     As referenced above, plaintiff is informed and believes that in 2014 defendant Promise Corporation made the decision to refinance and/or seek a line of credit based upon the value and profitability of Silver Lake Hospital. Once that decision was made, defendant Promise Corporation, through defendants Hopwood and Armstrong, withdrew excessive revenue from hospital operations and refused to provide adequate funds for the maintenance of plaintiff's

- 9 -

PLAINTIFF'S COMPLAINT FOR DAMAGES

surgical program. Instead, almost all of the money generated by the hospital was kept as "profit" to make lenders perceive the business as more 'financially healthy" than it actually was. The decision to refrain from sinking money generated by the facility back into it, resulted in the problems with maintenance referenced above and expressed more significantly below.

25.    In mid 2014, plaintiff representatives in no uncertain terms informed defendants that the hospital's air-conditioning system was inadequate and that the failure to keep the facility cool was raising the risk of infection to patients and likely had been the cause of several infections that had arisen from past surgeries. Consequently, physicians scheduled by plaintiff to perform surgeries were refusing to perform at Silver Lake Hospital, not only due to the increased risk of infection to their patients, but also due to the increase of their own risk of exposure to malpractice claims from said patients should infection occur.  Plaintiff was reassured by defendants Success Corporation, Cope and Watkins on several occasions that the temperature controls of the hospital would be addressed and that they would seek funding from " corporate" (defendants Promise Corporation, Hopwood and Armstrong), to replace the air-conditioning system.

26.    Again in October 2014 the issue of hospital maintenance was raised by plaintiff to defendants. On this occasion, in addition to the complaints about temperature controls, a spine surgeon refused to operate any longer as part of plaintiff's program at Silver Lake Hospital due to inadequate surgery lights (which the doctor believed had compromised one of his surgical outcomes in the past), an inadequate nursing staff, a nonfunctioning C-Arm (a medical imaging device used to evaluate location of implants and accuracy of screw placement during surgery) and a canceling of the breakfast meal (which most hospitals provide for their surgeons). Once again, defendants reassured plaintiff that these matters would be taken care of.

27.    Defendant's failures to address the temperature controls at the hospital persisted despite plaintiff's consistent complaints. Plaintiff went as far as to offer to rent specialty surgical

- 10 -

PLAINTIFF'S COMPLAINT FOR DAMAGES

"spot coolers" to place in the operating room to provide an appropriate temperature and in this way address the concerns of the surgeons and promote patient safety. However, defendants rejected plaintiffs' offers to provide such remedies and continued to reassure plaintiff that the temperature issues would be addressed.

28.    In March 2016, in response to further temperature problems, plaintiff once again attempted to take matters into its own hands by contacting an HVAC specialist who had worked with defendants in the past for the purpose of outlining an approach and payment schedule for defendants to replace the air-conditioning system at the hospital. This effort was rebuked by Rick Coffin of RFMS Consulting, an individual hired by defendants Promise Corporation, Hopwood and Armstrong. Mr. Coffin informed plaintiff in no uncertain terms that plaintiff's actions were improper and that plaintiff should refrain from contacting any and all facility contractors in regards to work to be conducted at Silver Lake Hospital. He additionally assured plaintiff that it was his (Coffin's) job to come up with a systematic way in which the cost of air-conditioning at the hospital could be economically absorbed by defendants and implemented.

29.    Despite all of plaintiff's complaints in regards to the temperature controls of the hospital, no adequate air conditioning repairs have ever been conducted by Mr. Coffin, RFMS or defendants. Only "band-aid" solutions with extensive failure rates were implemented. Given defendants' extensive mis-management of Silver Lake Hospital, surgeons have withdrawn from plaintiff's program. Where plaintiff once had 18 surgeons participating in the program, with surgeries scheduled on a weekly if not daily basis, plaintiff's roster of surgeons has dwindled to 3 with even those doctors refusing to schedule and perform surgeries without assurances as to temperature control. Needless to say, the intentional refusal of defendants to maintain adequate working conditions at the Silver Lake Hospital has caused plaintiff's surgical program to implode. Not only has the revenue generated from this program been eviscerated, but plaintiff's reputation

- 11 -

PLAINTIFF'S COMPLAINT FOR DAMAGES

1    in regards to its ability to adequately manage a surgical program has also been damaged.  The

2    community of orthopedic and neurospine surgeons is a small community. The implosion of

3
     plaintiff's program at Silver Lake has negatively impacted plaintiff's ability to attract quality
4

5    surgeons to this and its other programs.

6         30.    As stated above, plaintiff is informed and believes that when defendants Promise

7    Corporation, Hopwood and Armstrong made the decision to artificially inflate the hospital's

8    financial picture for lenders, they made the determination to extract all revenue from the hospital

9    and minimally maintain it. Thus, despite the representations to plaintiff by defendants Success

10   Corporation, Cope and Watkins that the maintenance issues referenced above would be addressed,

11
     defendants never had any intention of ever investing appropriate maintenance dollars in the
12
     facility to remedy its problems.
13

14        31.    Most recently, just weeks after plaintiff was informed that no arbitration would go

15
     forward, where once again plaintiff received reassurances that plaintiff's contract would be
16
     amended to reflect more accurately the duties of the parties; that the "debt issue" would be
17
18   resolved and that maintenance issues would be dealt with, defendants Promise Corporation and

19   Armstrong forwarded to plaintiff a termination letter in regards to defendant Success

20   Corporation's contract.  Said letter included a demand for $1,467,663 dollars, to be paid within ten

21   (10) days with no extension to be granted.  As referenced above, the majority of the sum

22   demanded encompassed the above referenced debt created by Success Corporation, Cope and
23
     Watkins as a result of their mis-management and malfeasance.
24
          32.    Plaintiff is informed and believes that all of the actions of defendants and each of
25
26   them, including defendants' willingness to overlook the breach of contract and potential

27   malfeasance of defendants Success Corporation, Cope and Watkins, was brought about by

28   defendants perception that plaintiff's contract for its surgical program was not as financially

PLAINTIFF'S COMPLAINT FOR DAMAGES

advantageous for the hospital as they thought it should be. It was defendant's belief that the hospital would make more profit, look more attractive to lenders and ultimately to potential buyers without plaintiff's contract. Therefore, defendants intentionally schemed to rid defendant Success Corporation of said contract by overlooking corporate breaches, potential malfeasance by corporate officers and refusing to maintain the hospital facility to support plaintiff's surgical program. Defendant's most recent actions to deny plaintiff the right to arbitration pursuant to contract; to unilaterally terminate said contract and to demand payment of the debt created by defendants own improper actions and potential malfeasance constitutes a classic example of a large, wealthy corporate entity acting with impunity and without consideration of legal rights, to crush a smaller entrepreneurial business, all to make itself more profitable.

### **FIRST CAUSE OF ACTION**

### **TORTIOUS INTERFERENCE WITH CONTRACT**
(Against Defendants Cope, Watkins, Promise Corporation, Hopwood and Armstrong)

33.      Plaintiff incorporates all allegations set forth in the above paragraphs as though fully set forth herein.

34.      It is axiomatic that California recognizes a cause of action against non-contracting parties who interfere with the performance of a contract.  A stranger to a contract may be liable in tort for intentionally interfering with the contract. To recover in tort for intentional interference with the performance of a contract, plaintiff must prove (1) a contract between plaintiff and another party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) an actual breach or disruption of the contractual relationship; and (5) resulting damage.

35.      As set out above, it cannot be denied that plaintiff engaged in an express written contract with defendant Success Corporation; that defendants who were nonparties to the

- 13 -

PLAINTIFF'S COMPLAINT FOR DAMAGES

contract, including but not limited to named defendants Cope, Watkins, Promise Corporation, Hopwood and Armstrong had knowledge of plaintiff's contract with defendant Success Corporation and as set out above and incorporated herein, said nonparty defendants engaged in multiple intentional acts designed to induce a breach or disruption of plaintiff's contractual relationship with defendant Success Corporation.  Such acts included but were not limited to those of defendants Cope and Watkins in refusing to honor the express contractual provision not to enter into any agreements or other financial relationships with any new entities relating to spinal surgeries without giving express notice to plaintiff.   The breaches of this contract provision by defendants Cope and Watkins prevented plaintiff from investigating and reviewing such entities for issues such as regulatory compliance, reputation and relationships with other hospitals and surgeons.  These breaches prevented plaintiff from discovering that defendants Cope and Watkins were mismanaging the hardware program and making misrepresentations to Promise Corporation that plaintiff was the party responsible for the more than $1 million in debt accrued as a result of defendants' mismanagement of the hardware portion of the program.

36.     Additionally, it cannot be denied that the actions and inactions of defendants Promise Corporation, Hopwood and Armstrong in intentionally refusing to maintain the Silver Lake hospital facility constituted a violation of defendants' obligation of good faith and fair dealing under the contract.  This breach of plaintiff's contract caused danger to patients and significant cause of physicians withdrawing themselves from plaintiff's surgical program.

37.     As was its right under the contract, plaintiff notified defendant Success Corporation of its desire to go to arbitration with regards to the management issues that created the above referenced debt, the responsibility of the debt and the failure to maintain the hospital premises.  In response to plaintiff's demand, plaintiff representatives were met by defendant Hopwood representing defendant Promise Corporation.  Defendant Hopwood once again made

- 14 -

empty reassurances to plaintiff that its concerns would be addressed. Then, shockingly, he also informed plaintiff in no uncertain terms that Success Corporation would not be going to arbitration and that if plaintiff insisted on arbitration plaintiff would never do business with one of defendant's facilities again.

38.    It is the position of plaintiff that these actions and inactions on the part of defendants intentionally caused a breach and/or disruption of the contract running between plaintiff and Success Corporation thus causing an evisceration of plaintiff's surgical program at the Silver Lake facility and a loss in excess of $2 million year in revenue as well as damage to plaintiff's reputation as an entity capable of running a surgical program within a hospital facility.

39.    Plaintiff is informed and believes and therefore alleges that the intentional actions of defendants were in conscious disregard of the rights of plaintiff; interfered with and/or disrupted plaintiff's relationship with its contracting partner and caused plaintiff to lose the economic benefits and advantages reasonably expected from said relationship. All such actions were conducted by defendants with the intention of providing profit to defendant's and creating a detriment to plaintiff. As set out above, it is the position of plaintiff that defendants and each of them were guilty of fraud, oppression and/or malice such that, in addition to actual damages, general damages and/or special damages, plaintiff is entitled to damages for the sake of example and by way of punishing defendants in an amount to be determined at trial

## SECOND CAUSE OF ACTION

## INTENTIONAL INTERRERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
(Against All Defendants)

40.    Plaintiff incorporates by reference all previous paragraphs as though fully set forth herein.

41.    California recognizes a cause of action for intentional interference with another's

- 15 -

PLAINTIFF'S COMPLAINT FOR DAMAGES

prospective business advantage when defendant disrupts or diverts the business relationship of another by improper methods which fall outside the boundaries of fair competition.

42.    To state a cause of action for intentional interference with prospective business advantage, plaintiff must show (1) an existing business relationship or the existence of a "prospective business relationship;" (2) the probability of future economic benefit from a business relationship; (3) that injurious interference did in fact occur; (4) that defendant must have engaged in wrongful conduct that falls outside the boundaries of fair competition; (5) that defendant must of known of and intended to interfere with plaintiff's prospective business advantage; and (6) that the interference of defendant caused foreseeable harm/damage to plaintiff

43.    It cannot be denied that defendants and each of them knew of plaintiff's contractual relationship with defendant Success Corporation; that said relationship brought significant revenue to plaintiff; and that that plaintiff had a logical expectation that it would enjoy future economic benefit from said business relationship. It is the position of plaintiff that defendants and each of them had the intent to overlook the above referenced breach of contract and potential malfeasance on the part of defendants Cope and Watkins regarding their obligation to notify plaintiff concerning the procuring of new vendors by Success Corporation. This willingness to overlook said breaches and malfeasance was brought about by defendants' perception that plaintiff's contract for its surgical program was not as financially advantageous for the hospital as they thought it should be. It was defendant's belief that the hospital would be more profitable and look more attractive to lenders and to potential buyers without plaintiff's contract. Therefore, defendants intentionally schemed to rid defendant Success Corporation of plaintiff's contract by overlooking the corporate breaches and the potential malfeasance by corporate officers and by refusing to maintain the hospital facility or supporting plaintiff's surgical program.

44.    In addition, as was its right under the contract, plaintiff notified defendant

- 16 -

PLAINTIFF'S COMPLAINT FOR DAMAGES

1   Success Corporation of its desire to go to arbitration with regards to the corporate breaches and

2   potential malfeasance by corporate officers as well as defendants' refusal to maintain the facility.

3   In response to plaintiff's demand, plaintiff representatives were met by defendant Hopwood

4   representing defendant Promise Corporation.  As had happened on numerous occasions in the past,

5   defendant Hopwood offered empty reassurances to plaintiff that his concerns would be addressed.

6   Shockingly, however, he also informed plaintiff in no uncertain terms that Success Corporation

7   would not be going to arbitration and that if plaintiff insisted on arbitration plaintiff would never

8   do business with one of defendants' facilities again.

9   

10       45.    All such actions the part of defendants were wrongful and outside the boundaries of

11   fair competition. All such actions on the part of defendants and each of them constituted injurious

12   interference of plaintiff's business relationship with defendant Success Corporation, with

13   plaintiff's doctors who had dedicated themselves to the program and with regards to plaintiff's

14   

15   efforts to develop additional surgical programs at other hospital facilities.

16       46.    It is the position of Plaintiff that all Defendants other than defendant Success

17   Corporation intentionally interfered with the relationship between Plaintiff, its surgical program

18   and plaintiff's contract with defendant Success Corporation; a relationship that had been and

19   would have continued to be an economic benefit to Plaintiff but for the actions of non-contracting

20   defendants.   All non-contracting defendants and each of them knew or should have known of

21   

22   plaintiff's relationship with defendant Success and the prospective business opportunity the

23   relationship provided for plaintiff.  Defendants and each of them acted in conscious disregard of

24   the rights of Plaintiff in eviscerating plaintiff's surgical program at the Silver Lake facility;

25   damaging plaintiff's reputation with the doctors he had engaged in his program and by damaging

26   plaintiff's reputation with other surgical facilities who have engaged plaintiff's program and/or

27   who may be in need of the plaintiff's surgical program in the future.   All such actions on the part

28   

- 17 -

PLAINTIFF'S COMPLAINT FOR DAMAGES

of defendants have resulted in business losses to plaintiff and have caused a severe and negative economic impact on Plaintiff. It is the position of Plaintiff that the intentional actions of Defendants and each of them have constituted a substantial factor in causing such damages. As set out above, it is the position of Plaintiff that Defendants and each of them were guilty of fraud, oppression and/or malice such that, in addition to actual damages, general damages and/or special damages, Plaintiff is entitled to damages for the sake of example and by way of punishing Defendants in an amount to be determined at trial. Plaintiff should also be entitled to prejudgment and post judgment interest on the balance due.

## THIRD CAUSE OF ACTION

## NEGLIGENT INTERRERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
(Against All Defendants)

47.     Plaintiff incorporates by reference all previous paragraphs as though fully set forth herein.

48.     A cause of action exists for negligent interference with another's prospective business advantage if the defendant acts unreasonably and wrongfully so as to foreseeably disrupt a business advantage of another. To state a cause of action for negligent interference with prospective business advantage, plaintiff must show (1) an existing business relationship or the existence of a "prospective business relationship;" (2) that defendant owed a duty of care to plaintiff; (3) that defendant wrongfully interfered with Plaintiff's business relationship; (4) that defendant proximately caused plaintiff's injury and damage by interfering with plaintiff's business relationship; and (5) that the damage caused was foreseeable.

49.     It is the position of plaintiff that it cannot be denied that defendants and each of them knew of plaintiff's contractual relationship with defendant Success Corporation; that said relationship brought significant revenue plaintiff; and that that plaintiff had a logical expectation

- 18 -

PLAINTIFF'S COMPLAINT FOR DAMAGES

that it would enjoy future economic benefit from said business relationship. It is the position of

plaintiff that defendants and each of them had a duty to plaintiff to act in such a fashion so as not

to disturb or disrupt much less eviscerate the relationship between plaintiff and defendant Success

Corporation.

50.    Is the position of plaintiff that defendants and each of them acted unreasonably and

wrongfully so as to foreseeably disrupt plaintiff's business relationship with defendant Success

Corporation.  Additionally, it is the position of plaintiff that defendant's actions foreseeably

disrupted plaintiff's business relationship with doctors within his program and with other facilities

seeking surgical programs such as plaintiffs.

51.    Given the facts as referenced above, all such actions of defendants and each of

them caused damage to plaintiff's business with Success Corporation and its business reputation in

the healthcare community.  All such actions on the part of defendants have had a severe and

negative economic impact on plaintiff.  It is the position of Plaintiff that the actions of Defendants

and each of them have constituted a substantial factor in causing said harm. Therefore plaintiff is

entitled to all economic damages including lost profits as a result of the injuries to its business and

its business reputation in an amount to be proved at the time of trial

## FOURTH CAUSE OF ACTION

### BREACH OF CONTRACT
(Against Defendant Success Corporation)

52.    Plaintiff incorporates by reference all previous paragraphs as though fully set forth

herein.

53.    A breach of contract action must allege: (1) the existence of a contract and its terms

that establish the obligation at issue; (2) that plaintiff has fulfilled his obligations that he is

required to perform; (3) that defendant is guilty of an unjustified or unexcused failure to perform

- 19 -

under the contract; and (4) that plaintiff suffered damages as a result.    It is beyond dispute that at all relevant times, a written contract was in full force and effect between plaintiff and defendant Success Corporation, whereby defendant warranted, guaranteed, promised, pledged and agreed to abide by the conditions stated therein.

54.    As referenced above, Plaintiff and defendant Success Corporation entered into a contract wherein plaintiff was to assist Silver Lake Hospital in developing a sustainable surgical program.  It was agreed that plaintiff would provide defendant Success Corporation and Silver Lake with management services relating to the hospital spine surgery program. Such services were to include, but not be limited to, maintaining good relationships between the hospital and the physicians participating in the spine surgery program; facilitating the resolution of issues that may arise between the hospital and physicians; developing relationships with qualified physicians to participate in the spine surgery program; facilitating physician application processes to become a member of the hospital medical staff; consulting and advising the hospital and defendant Success Corporation with regards to payor plans; arranging for the prequalification of patients and the preauthorization of surgeries; and providing other advice and recommendations concerning the conduct of the hospital's spine surgery program.

55.    In addition, plaintiff was to serve as the exclusive provider of collection services with respect to all claims for inpatient procedures and related supplies arising from surgical procedures performed by the physicians. It was expressly agreed as one of the "Hospital's Duties" that prior to entering into any agreements or other financial relationships with any new vendors relating to spinal surgeries, that the hospital would give plaintiff 30 days written notice of such proposed relationship. This was to allow plaintiff to investigate and review such relationships for issues such as regulatory compliance, reputation of the contracting entity and the potential for improper relationships with physicians or other hospitals and to advise defendant Success

- 20 -

PLAINTIFF'S COMPLAINT FOR DAMAGES

1  Corporation and the hospital with regards to the same.

2      56.    Within the first few years of the contract, defendant Success Corporation, through

3  defendants Cope and Watkins demanded that they be allowed to take over the responsibility of

4  purchasing relevant hardware (rods, screws, cages, etc.) to be used by surgeons and implanted

5

6  during the course of spinal surgeries.  Through most of 2014 and into the latter half of 2015 (an

7  approximate 20 month time frame), defendants Success Corporation, Cope and Watkins,

8  unbeknownst to plaintiff, breached their contract with plaintiff by failing to provide notice, written

9  or otherwise, that they had entered into agreements and other financial relationships with other

10  vendors in relation to spine surgeries. Thus, plaintiff was unable to review said agreements and

11  financial relationships as to how they affected the surgical program and/or whether the actions of

12

13  said vendors were in compliance with the law. During this time, defendants Success Corporation,

14  Cope and Watkins created a debt in excess of $1 million for themselves. Plaintiff is informed and

15  believes that on its face, this debt was created by defendant Success Corporation's assumption of

16  the hardware costs and mismanagement of program related issues.  Subsequently, defendant made

17  the decision to transfer the hardware responsibilities back plaintiff.  Then, defendant attempted to

18  blame plaintiff for the approximate $1 million discrepancy in the accounting that occurred during

19  the time of defendant's breach.

20

21      57.    In addition, defendant failed to maintain adequate conditions at Silver Lake

22  hospital in order to allow spine surgeries to be safely performed there. Since mid 2014, defendant

23  had been expressly informed by plaintiff that defendant's failure to properly maintain Silver Lake

24  Hospital was negatively impacting plaintiff's surgical program and endangering patients.

25  Plaintiff representatives in no uncertain terms informed defendant that the hospital's air-

26  conditioning system was inadequate and that the failure to keep the facility cool was raising the

27  risk of infection to patients and likely had been the cause of several infections arising from past

28

PLAINTIFF'S COMPLAINT FOR DAMAGES

surgeries.  Again in October 2014 the issue of hospital maintenance was raised by plaintiff to defendant.  In regards to this incident, in addition to the complaints about temperature controls, a spine surgeon refused to operate any longer as part of plaintiff's program at Silver Lake Hospital due to inadequate surgery lights (which the doctor believed that compromise one of his surgical outcomes in the past), an inadequate nursing staff, a nonfunctioning C-Arm (a medical imaging device used to evaluate location during surgery) and a canceling of the breakfast meal (which most hospitals provide for their surgeons). Once again, defendants reassured plaintiff that these matters would be addressed.  Unfortunately, the temperature controls and most of the other maintenance issues at the hospital were never properly addressed despite plaintiff's complaints.

58.    No significant and/or effective air conditioning repairs have been conducted by defendants at Silver Lake Hospital.  As a result of defendant's refusal to maintain the facility, numerous surgeons have withdrawn from plaintiff's program.  The intentional refusal of defendant to maintain adequate working conditions at the Silver Lake Hospital has caused plaintiff's surgical program to implode.  This has not only resulted in damage to plaintiff's ability to earn revenue with defendant Success Corporation.  The news of this recent business failure has also negatively impacted plaintiff's ability to attract quality surgeons to its program and to attract opportunities from other hospitals desiring to create such a surgical program.

59.    It is the position of plaintiff that the actions of defendant constitute a breach of contract. As stated above, defendant has engaged in an unjustified and unexcused failure to perform that portion of the contract obligating defendant to notify plaintiff of all new vendors solicited for the spine program. Defendant's breach was compounded by the fact that defendant's relationship with the new vendors and other mismanagement of hardware related issues, resulted in a $1 million obligation to defendant. Defendant's breach is further compounded by the fact that defendant has attempted to blame the $1 million debt on plaintiff. In addition, defendant has

- 22 -

consistently failed to maintain the Silver Lake Hospital facility in such a fashion as to allow

surgeries to be performed safely within said facility.

60.     As a final matter and as referenced above, as was its right under the contract,

plaintiff notified defendant Success Corporation of its desire to go to arbitration with regards to

the corporate breaches and potential malfeasance by corporate officers as well as defendants'

refusal to maintain the facility. Shockingly, in response to plaintiff's demand, defendant informed

plaintiff in no uncertain terms that Success Corporation would not be going to arbitration and that

if plaintiff insisted on arbitration plaintiff would never do business with one of defendant's

facilities again.

61.     In every contract there is an implied covenant of good faith and fair dealing by

each party not to do anything which will deprive the other party of the benefits of the contract. A

breach of this covenant by failing to deal fairly and in good faith with the other party gives rise to

an action for damages. It is position of plaintiff that defendant, by failing to cooperate with the

plaintiff in the performance of the contract breached its implied covenant of good faith and fair

dealing to plaintiff. Therefore, it is position of plaintiff that defendant, for all of the reasons cited

above, is liable to plaintiff for all compensatory damages proximately resulting from defendant's

conduct an amount to be proved at the time of trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, SURGICAL PROGRAM DEVELOPMENT, LLC., prays for the

following relief:

1.     An award to Plaintiff of general damages against each defendant in amounts to be

determined at the time of trial;

2.     An award to Plaintiff of special damages against each defendant in amounts to be

determined at the time of trial;

PLAINTIFF'S COMPLAINT FOR DAMAGES

1       3.     An award of profits lost against each defendant as a result of the actions of

2 defendants to be determined at the time of trial;

3       5.     An award of exemplary or punitive damages as against each defendant in amounts

4 to be determined at the time of trial;

5       6.     An award to Plaintiff of reasonable attorneys' fees and costs pursuant to applicable

6 law;

7       7.     An award to Plaintiff of prejudgment and post judgment interest to the extent

8 permitted by applicable law; and

9       8.     An award of all such other and further relief as this Court may deem just and

10 appropriate.

11

12

13

14

15

16

17 Dated: August 22, 2017                   THE CARREON FIRM

18

19                                    Patrick A. Carreon, Esq.

20                                    Attorney for Plaintiff,
                                   Surgical Program Development, LLC

21

22

23

24

25

26

27

28

PLAINTIFF'S COMPLAINT FOR DAMAGES

CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
Patrick A. Carreon (SBN 119576)
THE CARREON FIRM
444 W. Ocean Blvd. Suite 505
Long Beach, California 90802
TELEPHONE NO.: 562-432-9999   FAX NO.: 562-432-9990

**ATTORNEY FOR** *(Name):*

*FOR COURT USE ONLY*

**FILED**
Superior Court of California
County Of Los Angeles

**AUG 24 2017**

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
Charlie L. Coleman

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS: Los Angeles, California 90012
CITY AND ZIP CODE:
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Surgical Program Development, LLC v. Success Healthcare 1, LLC et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000)   [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | BC 6 7 3 6 5 6<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[✓] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [✓] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [✓] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [✓] punitive

4. Number of causes of action *(specify):* Four

5. This case [ ] is [✓] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 8/23/2017

PATRICK A. CARREON
(TYPE OR PRINT NAME)

_____ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov



CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases, only parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
 Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
 Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
 Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
   Wrongful Death
 Product Liability *(not asbestos or
  toxic/environmental)* (24)
 Medical Malpractice (45)
  Medical Malpractice–
   Physicians & Surgeons
  Other Professional Health Care
   Malpractice
 Other PI/PD/WD (23)
  Premises Liability (e.g., slip
   and fall)
  Intentional Bodily Injury/PD/WD
   (e.g., assault, vandalism)
  Intentional Infliction of
   Emotional Distress
  Negligent Infliction of
   Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
 Business Tort/Unfair Business
  Practice (07)
 Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
 Defamation (e.g., slander, libel)
  (13)
 Fraud (16)
 Intellectual Property (19)
 Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
   *(not medical or legal)*
 Other Non-PI/PD/WD Tort (35)

**Employment**
 Wrongful Termination (36)
 Other Employment (15)

**Contract**
 Breach of Contract/Warranty (06)
  Breach of Rental/Lease
   Contract *(not unlawful detainer
   or wrongful eviction)*
  Contract/Warranty Breach–Seller
   Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
   Warranty
  Other Breach of Contract/Warranty
 Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
   Case
 Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
 Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
 Eminent Domain/Inverse
  Condemnation (14)
 Wrongful Eviction (33)
 Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
   domain, landlord/tenant, or
   foreclosure)*

**Unlawful Detainer**
 Commercial (31)
 Residential (32)
 Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*

**Judicial Review**
 Asset Forfeiture (05)
 Petition Re: Arbitration Award (11)
 Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
   Case Matter
  Writ–Other Limited Court Case
   Review
 Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
   Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
 Antitrust/Trade Regulation (03)
 Construction Defect (10)
 Claims Involving Mass Tort (40)
 Securities Litigation (28)
 Environmental/Toxic Tort (30)
 Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)

**Enforcement of Judgment**
 Enforcement of Judgment (20)
  Abstract of Judgment (Out of
   County)
  Confession of Judgment *(non-
   domestic relations)*
  Sister State Judgment
  Administrative Agency Award
   *(not unpaid taxes)*
  Petition/Certification of Entry of
   Judgment on Unpaid Taxes
  Other Enforcement of Judgment
   Case

**Miscellaneous Civil Complaint**
 RICO (27)
 Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
   harassment)*
  Mechanics Lien
  Other Commercial Complaint
   Case *(non-tort/non-complex)*
  Other Civil Complaint
   *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
 Partnership and Corporate
  Governance (21)
 Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
   Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
   Claim
  Other Civil Petition

| SHORT TITLE: Surgical Program Development v. Success Healthcare | CASE NUMBER BC 673 656 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| **Applicable Reasons for Choosing Court Filing Location (Column C)** |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/ Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 1, 11 |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

LACIV 109 (Rev 2/16)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 1 of 4


| SHORT TITLE: Surgical Program Development v. Success Healthcare | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/Wrongful Death Tort** | Business Tort (07) | ☒ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
| | | ☒ A6031  Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation    Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032  Quiet Title | 2, 6 |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

| SHORT TITLE: Surgical Program Development v. Success Healthcare | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

| SHORT TITLE: Surgical Program Development v. Success Healthcare | CASE NUMBER |
|---|---|

**Step 4:** **Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected.  Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: | ADDRESS: |
|---|---|
| ☐ 1. ☐ 2. ☑ 3. ☐ 4. ☑ 5. ☐ 6. ☐ 7.  ☐ 8. ☐  9. ☐ 10. ☐ 11. | 1711 W. Temple St. |

| CITY: Los Angeles | STATE: CA | ZIP CODE: 90026 |
|---|---|---|

**Step 5:** **Certification of Assignment:** I certify that this case is properly filed in the Central _____ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: 8/23/2017 _____

_Patee A. Coee_
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev 2/16)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 4 of 4

# Exhibit 57

**EXHIBIT**

**SPD 15**

| | |
|---|---|
| **From:** | James.Hopwood@promisehealthcare.com |
| **Sent:** | Sunday, November 26, 2017 7:36 PM |
| **To:** | Peter Baronoff <Peter.Baronoff@promisehealthcare.com> |
| **Cc:** | Mike Young <Mike.Young@promisehealthcare.com>; George Watkins <GWatkins@silverlakemc.com>; Fatima Manuao <fmanuao@silverlakemc.com>; Suzanne K. Sterling, Esq. <Suzanne.Sterling@promisehealthcare.com> |
| **Subject:** | SPD / Brendan Bakir |
| **Attach:** | SPD payment RECON 11 26 17.pdf |

Peter,

Since working directly and systematically with Brendan Bakir over the last 12 months, we have collected $747 thousand of payments from Surgical Program Development ("SPD"). While these payments helped to reduce existing balances, two issues were highlighted: 1.) SPD requested that we allocate the payments to patient accounts in a way that (i) credited SPD for overpayments by SPD to patient accounts from 1/1/14 through 8/10/15 and (ii) therefore required amounts larger than the total payment to be allocated to more current accounts (we did not apply the payments in this manner), and 2.) an acceptable agreement was never reached to secure payments more timely from SPD to fund the working capital requirements of new surgeries. We have since started collecting and depositing Insurance Payer checks directly into our bank account, currently totaling $354 thousand, and fully applied these amounts (both SLMC and SPD portions) against our outstanding balances with SPD.

With these $1.1 million of payments applied to SPD's outstanding accounts, their balance now stands at $1.823 million as reflected by SLMC's records. While the records forwarded by SPD suggest a remaining balance owed to SLMC of $1.627 million, we are fairly certain most of the $1.1 million in payments has not been applied by SPD to their patient accounting records. More likely, SPD will argue that the remaining balance owed after applying all payments is closer to $500 thousand. We don't agree with this interpretation and this approximately $1.3 million variance between SLMC and SPD consists of accounting differences and contract disputes in several areas each of which need to be resolved to fully settle the balances.

By way of background, a quick timeline of the SPD contract is as follows: (i) Original contract 01/01/2010 thru 12/31/12 wherein SLMC was guaranteed 50% of the DRG plus reimbursement of certain hardware costs paid by SLMC. SPD operated a separate hardware company where much of the activity was directed, (ii) Amendment 1 - does not change rates, (iii) Amendment 2 - 01/01/2013 thru 12/31/13 wherein SLMC was guaranteed 40% of the DRG plus reimbursement of certain hardware costs paid by SLMC, (iv) Amendment 3 –never signed but was supposed to start 01/01/2014. It was proposed that SLMC was guaranteed 50% of the DRG with SLMC responsible for hardware costs without additional reimbursement under a critical assumption of $3,500 PPD minimum guarantee to SLMC, (v) Starting 8/11/15, SPD and SLMC agreed to continue with SLMC receiving 40% of the DRG plus reimbursement of certain hardware costs. Biologics costs would not be reimbursed.

The following variances comprise the expected $1.2 million difference of amounts owed to SLMC:

1. $670 thousand. 1/1/14 through 8/10/15 cases. Upon review of the patient accounting detail, SPD originally calculated and paid SLMC at 40% of the DRG plus reimbursement of hardware costs. Accounting for payments with this calculation continued to be used by SPD for payments through early 2016. With this payment pattern, one would conclude that Amendment 3 was never implemented even as an unsigned business practice or oral agreement. More recent payments in late 2016 and throughout 2017 outlined credits to be applied to accounts from the 1/1/14 to 8/10/15 for this "overpayment" calculation and attempted to reverse payments down to a smaller 50% of the DRG without additional hardware reimbursement and without consideration for a $3,500 PPD guarantee.
2. $150 thousand. Variances between reimbursed hardware amounts versus non-reimbursed biologics costs during other periods. Certain vendors supply both hardware and biologics used in these surgeries. There are

**SPDvPROMISE 0001451**

classification differences of these costs when comparing the accounting of SPD versus SLMC.  SPD may be motivated to push more of the costs into biologics since they are SLMC's cost rather than properly classifying hardware versus biologics.  This needs to be resolved account-by-account by reviewing information between the parties.

3.  $480 thousand.  Variances between earlier payments posted to patient accounts on SPD records versus payments posted to patient accounts on SLMC records.  There is likely some double counting of credits by SPD given the recent payment distribution requests included with payments.  This needs to be resolved account by account by reviewing information between the parties.

The most important concept for you to discuss with Brendan is Item .1 proper pricing of the 1/1/14 to 8/10/15 period where accounts were initially reimbursed at 40% of DRG plus hardware and subsequently reversed to 50% of DRG without additional reimbursement.  On the attached spreadsheet you will note in the first several columns a summary of the insurance payments received by year, a recap of the SPD calculation of the amounts owed to SLMC and a recap of the SLMC calculation of the amounts owed to SLMC.  The SPD interpretation of reimbursement in 2014 and 2015 (stated as a percent of insurance payment) is significantly below future years and significantly below SLMC's expectations in 2014 and 2015.  As stated earlier, the SPD calculation for 2014 and 2015 appears to be a delayed and partial interpretation of unsigned Amendment 3 to artificially reduce the amount owed to SLMC.

More information is required to fully and accurately document the 2010 to 2013 contract period.  I will work with George and Fatima to get this information completed if you think this will be useful but we don't currently believe there is a dispute with this period.  However, the hardware company most certainly created additional revenue for SPD and Brendan until the reimbursement rules changed.

The details of items 2 and 3 above can be resolved directly between Brendan, George and myself once you have secured Brendan's agreement to be open book regarding their records for a full reconciliation.  I do have all of this information on an account by account basis to support a mutual resolution of the balances owed.  We simply need Brendan's cooperation.

As a final note, there is a recap of the number of days SPD held funds once received by the insurance payer.  Note that the number of days SPD held payment for cases with hardware grew from 83 days in 2014 to more than 200 days in each subsequent period until we began depositing insurance checks directly for 2017 cases.  Obviously, this delay in paying SLMC was a significant drain of SLMC's working capital since total reimbursements to SLMC have been more than $1.0 million annually.


James A Hopwood

Chief Financial Officer
Promise Healthcare, Inc.
Success Healthcare LLC
999 Yamato Road, Suite 300
Boca Raton, FL 33431
Office: 561 869 3100
Cell: 561 400 6904

SPDvPROMISE 0001452

| | Insurance Payment | Payment Lag Days to SLMC | SPD Calc of SLMC Portion | | SLMC Calc of SLMC Portion | | Surgical Program Development ("SPD") Version | | | | | | Silver Lake Medical Center ("SLMC") Version | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Full DRG Reimb. | SLMC Portion of DRG | SLMC Portion of DRG % | Hardware Invoice Amount | Payment by SPD | (Over)/ Under payment | Full DRG Reimb. | SLMC Portion of DRG | SLMC Portion of DRG % | Hardware Invoice Amount | Expected Reimbursement | Payment by SPD | (Over)/ Under payment |
| **2014** | | | | | | | | | | | | | | | | | | | |
| No Hardware | 556,324 | 107 | 193,551 | 35% | 234,964 | 42% | 477,446 | 193,551 | 41% | - | 213,588 | (20,048) | 477,010 | 190,804 | 40% | 44,160 | 234,964 | 228,899 | 6,065 |
| With Hardware | 1,289,541 | 83 | 506,231 | 39% | 760,207 | 59% | 1,014,674 | 506,231 | 50% | 341,283 | 833,755 | (327,524) | 994,787 | 402,337 | 40% | 357,870 | 760,207 | 831,193 | (70,986) |
| **2015 - 1/1/15 to 8/10/15** | | | | | | | | | | | | | | | | | | | |
| No Hardware | 307,186 | 172 | 109,652 | 36% | 110,121 | 36% | 274,130 | 109,652 | 40% | - | 137,065 | (27,413) | 275,303 | 110,121 | 40% | - | 110,121 | 137,065 | (26,944) |
| With Hardware | 1,869,768 | 239 | 565,416 | 30% | 939,619 | 50% | 1,130,851 | 565,425 | 50% | 388,544 | 797,793 | (232,367) | 1,134,989 | 453,996 | 40% | 485,623 | 939,619 | 724,353 | 215,087 |
| **2015 - 08/11/15 to 12/31/15** | | | | | | | | | | | | | | | | | | | |
| No Hardware | 102,450 | 187 | 31,846 | 31% | 34,645 | 34% | 79,615 | 31,846 | 40% | - | 27,870 | 3,976 | 78,226 | 31,290 | 40% | 3,355 | 34,645 | 37,420 | (2,775) |
| With Hardware | 998,684 | 204 | 500,855 | 50% | 533,682 | 53% | 606,119 | 242,448 | 40% | 258,408 | 256,031 | 244,824 | 605,989 | 242,396 | 40% | 291,287 | 533,682 | 292,218 | 241,464 |
| **2016** | | | | | | | | | | | | | | | | | | | |
| No Hardware | 457,833 | 170 | 142,529 | 31% | 156,067 | 34% | 356,322 | 142,529 | 40% | - | - | 142,529 | 361,345 | 148,312 | 41% | 7,755 | 156,067 | 28,477 | 127,590 |
| With Hardware | 2,348,691 | 229 | 1,263,054 | 54% | 1,325,304 | 56% | 1,767,087 | 706,835 | 40% | 556,219 | 91,490 | 1,171,564 | 1,773,616 | 711,352 | 40% | 613,952 | 1,325,304 | 380,536 | 918,848 |
| **2017** | | | | | | | | | | | | | | | | | | | |
| No Hardware | 198,220 | 34 | 69,750 | 35% | 72,259 | 35% | 174,376 | 69,750 | 40% | - | - | 69,750 | 176,938 | 70,775 | 40% | 1,483 | 72,259 | 60,096 | 12,163 |
| With Hardware | 1,106,797 | - | 601,863 | 54% | 636,268 | 57% | 856,532 | 342,613 | 40% | 259,250 | - | 601,863 | 867,649 | 346,759 | 40% | 289,509 | 636,268 | 233,441 | 402,828 |
| **Total** | 9,235,494 | | 3,984,756 | 43% | 4,803,136 | 52% | 6,737,152 | 2,910,880 | | 1,803,703 | 2,357,603 | 1,627,154 | 6,745,851 | 2,708,142 | | 2,094,994 | 4,803,136 | 2,953,698 | 1,823,339 |

SPDvPROMISE  0001453

# Exhibit 58

| From: | GWatkins@silverlakemc.com |
|---|---|
| Sent: | Monday, November 27, 2017 11:52 AM |
| To: | James Hopwood <James.Hopwood@promisehealthcare.com>; Peter Baronoff <Peter.Baronoff@promisehealthcare.com> |
| Cc: | Mike Young <Mike.Young@promisehealthcare.com>; Fatima Manuao <fmanuao@silverlakemc.com>; Suzanne Sterling <Suzanne.Sterling@promisehealthcare.com> |
| Subject: | RE: SPD / Brendan Bakir |
| Attach: | SPD Summary.docx |

**EXHIBIT**

SPD 16

Peter
Attached are some bullet points for your meeting with Brendan

**From:** James Hopwood [mailto:James.Hopwood@promisehealthcare.com]
**Sent:** Sunday, November 26, 2017 7:36 PM
**To:** Peter Baronoff <Peter.Baronoff@promisehealthcare.com>
**Cc:** Mike Young <Mike.Young@promisehealthcare.com>; George Watkins <GWatkins@silverlakemc.com>; Fatima Manuao <fmanuao@silverlakemc.com>; Suzanne Sterling <Suzanne.Sterling@promisehealthcare.com>
**Subject:** SPD / Brendan Bakir

Peter,

Since working directly and systematically with Brendan Bakir over the last 12 months, we have collected $747 thousand of payments from Surgical Program Development ("SPD"). While these payments helped to reduce existing balances, two issues were highlighted: 1.) SPD requested that we allocate the payments to patient accounts in a way that (i) credited SPD for overpayments by SPD to patient accounts from 1/1/14 through 8/10/15 and (ii) therefore required amounts larger than the total payment to be allocated to more current accounts (we did not apply the payments in this manner), and 2.) an acceptable agreement was never reached to secure payments more timely from SPD to fund the working capital requirements of new surgeries. We have since started collecting and depositing Insurance Payer checks directly into our bank account, currently totaling $354 thousand, and fully applied these amounts (both SLMC and SPD portions) against our outstanding balances with SPD.

With these $1.1 million of payments applied to SPD's outstanding accounts, their balance now stands at $1.823 million as reflected by SLMC's records. While the records forwarded by SPD suggest a remaining balance owed to SLMC of $1.627 million, we are fairly certain most of the $1.1 million in payments has not been applied by SPD to their patient accounting records. More likely, SPD will argue that the remaining balance owed after applying all payments is closer to $500 thousand. We don't agree with this interpretation and this approximately $1.3 million variance between SLMC and SPD consists of accounting differences and contract disputes in several areas each of which need to be resolved to fully settle the balances.

By way of background, a quick timeline of the SPD contract is as follows: (i) Original contract 01/01/2010 thru 12/31/12 wherein SLMC was guaranteed 50% of the DRG plus reimbursement of certain hardware costs paid by SLMC. SPD operated a separate hardware company where much of the activity was directed, (ii) Amendment 1 - does not change rates, (iii) Amendment 2 - 01/01/2013 thru 12/31/13 wherein SLMC was guaranteed 40% of the DRG plus reimbursement of certain hardware costs paid by SLMC, (iv) Amendment 3 –never signed but was supposed to start 01/01/2014. It was proposed that SLMC was guaranteed 50% of the DRG with SLMC responsible for hardware costs without additional reimbursement under a critical assumption of $3,500 PPD minimum guarantee to SLMC, (v) Starting 8/11/15, SPD and SLMC agreed to continue with SLMC receiving 40% of the DRG plus reimbursement of certain hardware costs. Biologics costs would not be reimbursed.

The following variances comprise the expected $1.2 million difference of amounts owed to SLMC:

SPDvPROMISE 0001454

1. $670 thousand. 1/1/14 through 8/10/15 cases. Upon review of the patient accounting detail, SPD originally calculated and paid SLMC at 40% of the DRG plus reimbursement of hardware costs. Accounting for payments with this calculation continued to be used by SPD for payments through early 2016. With this payment pattern, one would conclude that Amendment 3 was never implemented even as an unsigned business practice or oral agreement. More recent payments in late 2016 and throughout 2017 outlined credits to be applied to accounts from the 1/1/14 to 8/10/15 for this "overpayment" calculation and attempted to reverse payments down to a smaller 50% of the DRG without additional hardware reimbursement and without consideration for a $3,500 PPD guarantee.
2. $150 thousand. Variances between reimbursed hardware amounts versus non-reimbursed biologics costs during other periods. Certain vendors supply both hardware and biologics used in these surgeries. There are classification differences of these costs when comparing the accounting of SPD versus SLMC. SPD may be motivated to push more of the costs into biologics since they are SLMC's cost rather than properly classifying hardware versus biologics. This needs to be resolved account-by-account by reviewing information between the parties.
3. $480 thousand. Variances between earlier payments posted to patient accounts on SPD records versus payments posted to patient accounts on SLMC records. There is likely some double counting of credits by SPD given the recent payment distribution requests included with payments. This needs to be resolved account by account by reviewing information between the parties.

The most important concept for you to discuss with Brendan is Item .1 proper pricing of the 1/1/14 to 8/10/15 period where accounts were initially reimbursed at 40% of DRG plus hardware and subsequently reversed to 50% of DRG without additional reimbursement. On the attached spreadsheet you will note in the first several columns a summary of the insurance payments received by year, a recap of the SPD calculation of the amounts owed to SLMC and a recap of the SLMC calculation of the amounts owed to SLMC. The SPD interpretation of reimbursement in 2014 and 2015 (stated as a percent of insurance payment) is significantly below future years and significantly below SLMC's expectations in 2014 and 2015. As stated earlier, the SPD calculation for 2014 and 2015 appears to be a delayed and partial interpretation of unsigned Amendment 3 to artificially reduce the amount owed to SLMC.

More information is required to fully and accurately document the 2010 to 2013 contract period. I will work with George and Fatima to get this information completed if you think this will be useful but we don't currently believe there is a dispute with this period. However, the hardware company most certainly created additional revenue for SPD and Brendan until the reimbursement rules changed.

The details of items 2 and 3 above can be resolved directly between Brendan, George and myself once you have secured Brendan's agreement to be open book regarding their records for a full reconciliation. I do have all of this information on an account by account basis to support a mutual resolution of the balances owed. We simply need Brendan's cooperation.

As a final note, there is a recap of the number of days SPD held funds once received by the insurance payer. Note that the number of days SPD held payment for cases with hardware grew from 83 days in 2014 to more than 200 days in each subsequent period until we began depositing insurance checks directly for 2017 cases. Obviously, this delay in paying SLMC was a significant drain of SLMC's working capital since total reimbursements to SLMC have been more than $1.0 million annually.


James A Hopwood

Chief Financial Officer
Promise Healthcare, Inc.
Success Healthcare LLC
999 Yamato Road, Suite 300
Boca Raton, FL 33431

SPDvPROMISE 0001455

P001456

Office: 561 869 3100
Cell: 561 400 6904

SPDvPROMISE 0001456

Timeline: 2010 SLMC entered into a contract with SPD

- From 2010 to 2012 SPD steered SLMC to use a hardware vendor, Power Surgical Inc.

  Later on SLMC found out Brendan Bakir the owner of SPD was a principal in Power Surgical Inc.

  SPD paid for Biologics as well as hardware through 2013, contract never addresses biologic costs, but guarantee's SLMC a minimum percentage of the DRG.


- SPD contests hardware from 01/01/14 through 08/10/15, stated that SLMC did not give him an opportunity to negotiate discounts on the hardware and that the SLMC management cost the company over a million dollars. If you look at SPD's spreadsheet it shows that hardware cost were lower during the time in question and during that time SPD paid a consultant Karen White, Ms. White was emails on every spine program during the time in question.
- Per SPD's own spreadsheet average cost for hardware on cases with hardware were $ 9,010 per case between 01/01/14 through 08/10/15 and $ 9,257 per case from 08/11/15 to present, clearly showing that SLMC did not miss manage the cost of the hardware.


- SPD started cashing checks made out to Silverlake and Success after Dec 2016.

- We stopped signing the, assignment of accounts for collections in Oct 2016

- Brendan Bakir became president of HB Surgery Center Inc. in Hermosa Beach, stopped bringing OP surgeries to SLMC.

- 

SPDvPROMISE 0001457

# Exhibit 59

EXHIBIT

SPD22

STEVEN M. GOLDSOBEL (State Bar No. 166405)
KOMAL J. MEHTA (State Bar No. 265334)
LAW OFFICES OF STEVEN GOLDSOBEL,
A PROFESSIONAL CORPORATION
1901 Avenue of the Stars, Suite 1750
Los Angeles, CA 90067
Telephone: (310) 552-4848
Facsimile: (310) 695-3860
Email:  steve@sgoldsobel.com
        komal@sgoldsobel.com

Attorneys for Defendant and Cross Complainant
SUCCESS HEALTHCARE 1, LLC
d/b/a MEDICAL CENTER, and Defendants
PROMISE HEALTHCARE INC., JAMES
HOPWOOD AND GEORGE WATKINS

FILED
Superior Court of California
County of Los Angeles

MAR - 2 2018

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
      Nancy Alvarez

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES - CENTRAL DISTRICT

| | |
|---|---|
| SURGICAL PROGRAM DEVELOPMENT, LLC, a California Limited Liability Company <br><br> Plaintiff, <br><br> v. <br><br> SUCCESS HEALTHCARE 1, LLC, a California Limited Liability Company dba MEDICAL CENTER; PROMISE HEALTHCARE INC., a Florida Corporation; JAMES HOPWOOD, an individual; DAVID ARMSTRONG, an individual; BRENT COPE, an individual; GEORGE WATKINS, an individual and DOES 1 through 100, inclusive, <br><br> Defendants. <br> _____ <br><br> SUCCESS HEALTHCARE 1, LLC, d/b/a Silver Lake Medical Center <br><br> Cross-Complainant, <br><br> v. <br><br> SURGICAL PROGRAM DEVELOPMENT, LLC, a California Limited Liability Company <br><br> Cross-Defendant. | Case No. BC673656 <br> [Assigned for All Purposes to Hon. Robert J. Hess, Dept. 24] <br><br> **CROSS COMPLAINT BY SUCCESS HEALTHCARE 1, LLC, d/b/a SILVER LAKE MEDICAL CENTER** <br><br> Complaint Filed:  August 24, 2017 |

**DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL CENTER'S CROSS COMPLAINT**

1    Defendant and Cross Complainant Success Healthcare 1, LLC d/b/a Silver Lake Medical

2    Center ("SLMC"), by and through its attorneys of record, by way of its cross complaint against

3    Cross Defendant and Plaintiff Surgical Program Development, LLC ("SPD") hereby alleges as

4    follows:

5                                   **THE PARTIES**

6        1.    Defendant and Cross Complainant SLMC is and was, at all times material hereto,

7    a limited liability company organized under the laws of the State of California with its principal

8    place of business in Los Angeles County, California.  SLMC is a general acute care hospital

9    located in Los Angeles, California.

10       2.    On information and belief, Plaintiff and Cross Defendant SPD is and was, at all

11   times material hereto, a limited liability company organized under the laws of the State of

12   California with its principal place of business in Los Angeles County, California.  On further

13   information and belief, SPD has held itself out to have expertise in managing surgical programs

14   with hospitals and other surgical facilities.

15                               **COMMON ALLEGATIONS**

16       3.    SPD and its principal Brendan Bakir ("Bakir") promote themselves as industry

17   leaders with expertise in management of and collection for surgical programs within hospitals

18   such as SLMC.  SPD and Bakir also represent that they are knowledgeable regarding building

19   legally compliant and profitable surgical specialty programs.

20       4.    On or about June 1, 2010, SPD and SLMC entered into a Collections and

21   Management Services Agreement (the "Agreement").

22       5.    Pursuant to the Agreement, SPD agreed to provide timely and cost-effective

23   collection services for certain surgical procedures billed by SLMC to "private insurance payers,

24   Workers' funds or payers, and/or personal injury liens" ("Payers").  These procedures in large

25   part were spine-related procedures and often involved the implant of expensive hardware.  SPD

26   also agreed to assist SLMC in initiating, building, and managing a substantial and sustainable

27   orthopedic surgical program.

28

- 1 -

**DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL
CENTER'S CROSS COMPLAINT**

1      6.      SPD and SLMC subsequently amended the scope of the Agreement to include

2 additional collection and management services. The First Amendment did not amend any

3 existing provisions to the Agreement. Specifically, the terms regarding payment and collection

4 were unchanged.

5      7.      Pursuant to the Agreement, SPD was to receive compensation based on amounts

6 paid to SLMC by Payers. SPD was required under the Agreement to pay hardware vendors for

7 their costs.

8      8.      In or about June 2013, the Agreement was amended for a second time. The

9 Second Amendment dealt solely with compensation to SPD.

10      9.      SPD, however, did not adhere to the terms set forth in the Agreement. Instead,

11 SPD constantly and aggressively would monitor SLMC's collection of payments for surgeries

12 which were assigned to SPD for collection or for which SPD believed it was entitled to payment.

13 In fact, SLMC later learned that SPD was paying one of SLMC's employees to share "real time"

14 data with SPD regarding the details of SLMC's receipt of payments and Explanations of

15 Benefits.

16      10.     In recent years, when SLMC received a check for payment for which SPD was

17 entitled compensation, SPD would retrieve the check from SLMC. SPD represented to SLMC

18 that it would retain the checks until it prepared a calculation at month's end of what was owed to

19 SPD and then would return the accumulated checks to SLMC in exchange for payment to SPD.

20 At first, SPD followed through on its promise and returned all of SLMC's checks.

21      11.     Later, however, SPD began to retain the checks that it had retrieved from SLMC

22 and refused to turn them over at the end of each month. When pressed for the payments, SPD

23 falsely claimed that it did not need to pay SLMC its portion of the payments for 180 days from

24 the date of payment to SLMC. SPD thereafter collected – but failed to turn over – SLMC's

25 payments for the period December 2016 through early August 2017. These checks total more

26 than $1.7 million.

27      12.     The Agreement did not require SLMC to turn over checks to SPD. Section 3.6 of

28 the Agreement, which has never been amended, clearly states that "[a]ll payments by Payers or

- 2 -

1 others with respect to a Referred Case are to be made payable solely to 'Success Healthcare 1,

2 LLC' or as Hospital may otherwise direct in writing and are to be delivered to Hospital directly,

3 not to Company.  All settlements and orders for payment of Claims must reflect that payment

4 shall be made solely to 'Success Healthcare 1, LLC' or as Hospital may otherwise direct in

5 writing and are to be delivered to Hospital directly."  SPD had no contractual right to take

6 possession of the checks.

7   13. It was only through pressure and harassment that SPD succeeded in convincing

8 SLMC to turn over checks to SPD rather than depositing them directly into SLMC's bank

9 account.  As a result of SPD's refusal to return to SLMC its checks, a balance owing to SLMC

10 quickly grew and is now approximately $1.8 million.

11   14. SPD also stopped managing and paying hardware vendors.  Due to SPD's refusal

12 to carry out the terms of the Agreement, SLMC was forced to negotiate with and pay hardware

13 vendors, further increasing SLMC's damages as a result of SPD's breach of contract.

14   15. SPD managed to continue to obtain checks from SLMC while SLMC attempted to

15 obtain an agreement from SPD to turn over its funds.  On or about July 19, 2017, after nearly a

16 year of attempting to negotiate repayment of SPD's growing debt, SLMC sent a Notice to Cure

17 the Agreement and again demanded payment.  SPD did not cure and has continued to retain

18 SLMC's funds paid to SLMC by Payers for healthcare services rendered by SLMC.

19        **<u>FIRST CAUSE OF ACTION</u>**

20         **(Breach of Contract)**

21   16. SLMC hereby realleges and incorporates by reference paragraphs 1 through 15

22 above as if fully set forth herein.

23   17. SLMC and SPD entered into the Agreement.  The Agreement detailed the

24 compensation to be paid to SPD for various collection and management services. During the

25 relevant time period, SPD would receive 60% of the amount paid to SLMC but would be liable

26 for the hardware in those surgical cases where hardware was used.

27   18. SLMC performed or was prevented by SPD from performing all of the

28 requirements set forth in the Agreement that SLMC was required to perform.

- 3 -

1      19.     SPD materially breached the Agreement when it, among other breaches, failed to

2  pay hardware vendors and refused to turn over funds owed to SLMC pursuant to the Agreement.

3  Collectively and individually, these actions have materially breached the Agreement as a whole

4  and deprived SLMC of its contractual rights and the consideration it was entitled to receive

5  under the Agreement.

6      20.     As a result of SPD's breach of the Agreement, SLMC has been damaged in

7  excess of this Court's jurisdictional limit.

8

### SECOND CAUSE OF ACTION

9

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

10     21.     SLMC hereby realleges and incorporates by reference paragraphs 1 through 20

11  above as if fully set forth herein.

12     22.     In every contract or agreement there is an implied promise of good faith and fair

13  dealing. This means that each party will not do anything to unfairly interfere with the right of

14  the other party to receive the benefits of the contract. SPD has engaged in a deliberate course of

15  conduct to breach, undermine and frustrate the Agreement. This conduct evidences SPD's bad

16  faith and breach the covenant of good faith and fair dealing.

17     23.     SPD, among other acts, engaged in undisclosed dealings with physicians that

18  were contrary state and federal law and interfered with SLMC's relationship with its employees.

19  These actions, among others, were detrimental to the purpose and spirit of the Agreement, which

20  was to assist SLMC with its surgical department and grow revenue in compliance with state and

21  federal laws. Instead, SPD's malfeasance economically harmed SLMC and placed its

22  compliance with state and federal laws in jeopardy.

23     24.     On information and belief, SPD was fully aware that such actions could impact

24  and were contrary to the terms of its contractual relationship with SLMC and the interests of

25  SLMC.

26     25.     SLMC has fulfilled, or was prepared to fulfill, all the requirements set forth in the

27  Agreement.

28     26.     SLMC has been damaged and is entitled to damages to be proven at trial.

- 4 -

**DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL
CENTER'S CROSS COMPLAINT**

## THIRD CAUSE OF ACTION

### (Conversion)

27.    SLMC hereby realleges and incorporates by reference paragraphs 1 through 15 above as if fully set forth herein.

28.    In June 2010, SLMC and SPD entered into the Agreement, providing that SPD would, among other things, provide timely and cost-effective collection services for certain surgical procedures billed by SLMC to private insurance payers, Workers' funds or payers, and/or personal injury liens.

29.    These payments, totaling approximately $1.8 million normally would be sent to SLMC for deposit and accounting.  SPD represented to SLMC that it would turn over the checks after it prepared a calculation at month's end of what was owed to SPD.  SPD then would return the accumulated checks to SLMC in exchange for payment to SPD.  SLMC is the rightful owner of the approximately $1.8 million entrusted to SPD's custody and care.

30.    SLMC has made multiple demands for SPD to turn over the checks and proceeds received from Payers for health care services rendered to patients of SLMC.

31.    However, SPD intentionally and substantially interfered with SPD's property by refusing to turn over the checks that it had retrieved from SLMC.  When pressed for the payments, SPD claimed that it did not need to pay SLMC its portion of the payments for 180 days from the date of payment to SLMC.  SPD thereafter collected approximately $1.8 million of SLMC's payments for the period December 2016 through early August 2017.  SPD has completely failed and/or refused to account for SLMC's funds and has refused to return any of SLMC's funds.

32.    SLMC in no manner consented to SPD's misappropriation of SLMC funds.

33.    As a direct and proximate result of SPD's conversion of SLMC's monies, SLMC has been damaged in an amount to be determined at trial.

34.    As a result of SPD's intentional misconduct, recklessness, malice, and/or fraud alleged herein, SLMC is entitled to an award of punitive damages pursuant to *California Civil Code* § 3294.

- 5 -

DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL
CENTER'S CROSS COMPLAINT

## FOURTH CAUSE OF ACTION

(Accounting)

35.     SLMC hereby realleges and incorporates by reference paragraphs 1 through 34 above as if fully set forth herein.

36.     An agreement exists between SLMC and SPD wherein SLMC agreed to compensate SPD based upon a percentage of reimbursement received from private insurance payers, Workers' funds or payers, and/or personal injury liens.   SLMC entrusted SPD with said payments, trusting SPD to calculate the appropriate percentage owed.  This relationship allows for an appropriate claim for accounting to be made by SLMC.

37.     The Agreement requires, among other things, a duty to account for all revenue derived from Payers, as well as all expenses related to hardware.   Specifically, Section 1.3 of the Agreement states:

"Company [SPD] will keep and maintain for seven (7) years from the date of termination of Agreement, detailed books, records, and other documentation, whether in written or electronic form, pertaining to its Collection Services, including notes, logs, and correspondence pertaining to beneficiaries, services rendered by the Hospital [SLMC], and/or Payers against whom payment is sought by Hospital.  Such obligations survive termination of this Agreement.  Company shall promptly permit Hospital to access its records relating to the Collection Services upon request."

Further, Section 1.5 of the Agreement states:

"Company shall permit Hospital to audit, within a reasonable time of its request and during normal business hours, Company's reports submitted pursuant to the requirements of this Agreement.  Company shall cooperate with any compliance program established by the Hospital during the term hereof, including without limitation, giving Hospital and its representatives access to all claim records, data information, and software required by Hospital or Hospital's authorized agent who performs such audit.  Hospital may challenge any invoice submitted by Company within a reasonable time of receipt thereof."

- 6 -

1  These provisions of the Agreement never have been amended.

2      38.    SPD continues to fail and/or refuse to provide any such accounting to SLMC.

3      39.    As a result of the SPD's conduct, SPD has received money, a portion of which is

4  due to SLMC.

5      40.    The exact amount of money due from SPD to SLMC is unknown to SLMC  and

6  cannot be ascertained without an accounting of the aforementioned payments and expenses

7  relating to health care services rendered at SLMC which are subject to the Agreement, but SPD

8  has failed and refused, and continues to fail and refuse, to render such an accounting.

9                          **PRAYER FOR RELIEF**

10      WHEREFORE, Cross Complainant SLMC respectfully requests that this Court enter

11  judgment in its favor and against Cross Defendant SPD as follows:

12      1.    For compensatory and general damages;

13      2.    For costs of suit, including attorney's fees and costs;

14      3.    For pre- and post-judgment interest;

15      4.    For punitive damages; and

16      5.    For such further legal and equitable relief that this Court may deem just and

17          proper.

18

19                          Respectfully submitted,

20  Dated: March 2, 2018       LAW OFFICES OF STEVEN GOLDSOBEL,
                              A PROFESSIONAL CORPORATION

21

22

23  By: _____

24          STEVEN M. GOLDSOBEL
            KOMAL J. MEHTA
25          Attorney for Cross Complainant and
            Defendant Success Healthcare 1 LLC d/b/a
            Silver Lake Medical Center and Defendants
26          Promise Healthcare Inc., James Hopwood and
            George Watkins

27

28

-7-

**DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL
CENTER'S CROSS COMPLAINT**

## DEMAND FOR JURY TRIAL

Cross Complainant hereby demands a jury trial.

Dated: March 2, 2018

LAW OFFICES OF STEVEN GOLDSOBEL,
A PROFESSIONAL CORPORATION

By: _____

STEVEN M. GOLDSOBEL
KOMAL J. MEHTA
Attorney for Cross Complainant and
Defendant Success Healthcare 1 LLC d/b/a
Silver Lake Medical Center and Defendants
Promise Healthcare Inc., James Hopwood and
George Watkins

- 8 -

# Exhibit 60

STEVEN M. GOLDSOBEL (State Bar No. 166405)
VANDAD KHOSRAVIRAD (State Bar No. 253703)
LAW OFFICES OF STEVEN GOLDSOBEL,
A PROFESSIONAL CORPORATION
1901 Avenue of the Stars, Suite 1750
Los Angeles, CA 90067
Telephone: (310) 552-4848
Facsimile: (310) 695-3860
Email:  steve@sgoldsobel.com
        vandad@sgoldsobel.com

Attorneys for Defendant and Cross Complainant
SUCCESS HEALTHCARE 1, LLC
d/b/a MEDICAL CENTER, and Defendants
PROMISE HEALTHCARE INC., JAMES
HOPWOOD, GEORGE WATKINS, BRENT
COPE, and DAVID ARMSTRONG

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES - CENTRAL DISTRICT

| | |
|---|---|
| SURGICAL PROGRAM DEVELOPMENT, LLC, a California Limited Liability Company<br><br>Plaintiff,<br><br>v.<br><br>SUCCESS HEALTHCARE 1, LLC, a California Limited Liability Company dba MEDICAL CENTER; PROMISE HEALTHCARE INC., a Florida Corporation; JAMES HOPWOOD, an individual; DAVID ARMSTRONG, an individual; BRENT COPE, an individual; GEORGE WATKINS, an individual and DOES 1 through 100, inclusive,<br><br>Defendants.<br><br>———————————————<br><br>SUCCESS HEALTHCARE 1, LLC, d/b/a Silver Lake Medical Center<br><br>Cross-Complainant,<br><br>v.<br><br>SURGICAL PROGRAM DEVELOPMENT, LLC, a California Limited Liability Company<br><br>Cross-Defendant. | Case No. BC673656<br>[Assigned for All Purposes to Hon. Patricia Nieto, Dept. 24]<br><br>**DECLARATION OF GEORGE WATKINS IN SUPPORT OF SUCCESS HEALTHCARE 1, LLC'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR RIGHT TO ATTACH ORDER**<br><br>Date:  November 2, 2018<br>Time:  8:30 AM<br>Dept:  86<br>Judge:  Hon. Amy D. Hogue |

---

DECLARATION OF GEORGE WATKINS IN SUPPORT OF SUCCESS HEALTHCARE 1, LLC'S
OPPOSITION TO PLAINTIFF'S APPLICATION FOR RIGHT TO ATTACH ORDER

DECLARATION OF GEORGE WATKINS

I, GEORGE WATKINS, declare as follows:

1.     I am the Chief Financial Officer for Silver Lake Medical Center and have worked at the Silver Lake Medical Center in that capacity since May of 2012 on a part-time basis and continued on a full time basis from September of 2012 to the present.  I make this declaration in support of Success Healthcare 1, LLC's Opposition to Plaintiff Surgical Program Development's Application for Right to Attach Order.  I have personal knowledge of the facts set forth herein, and if called upon to testify thereto, I could and would competently do so under oath.

2.     Silver Lake Medical Center is a general acute care hospital located in Los Angeles, California owned and operated by Defendant Success Healthcare 1, LLC. In June 2010, SLMC and Surgical Program Development, LLC ("SPD") entered into a Collections and Management Services Agreement (the "Agreement"). A true and correct copy of the Agreement is attached hereto as **Exhibit 1**.

3.     Pursuant to the Agreement, SPD agreed to provide timely and cost-effective collection services for certain surgical procedures billed by the SLMC to "private insurance payers, Workers' funds or payers, and/or personal injury liens." (**Exhibit 1** Agreement at Recital B.) These procedures in large part were spine-related procedures and often involved the implant of expensive hardware. SPD also agreed to assist SLMC in initiating, building, and managing a substantial and sustainable orthopedic surgical program. The management of hardware and legally compliant recruitment of doctors were critical components of the program.

4.     The contract had a **collection services component**, such that Plaintiff was to serve as the provider of collection services with respect to claims for inpatient procedures and related supplies from vendors arising from surgical procedures performed by physicians.  In 2013, SPD's contract with SLMC was amended such that SPD would provide surgeons to SLMC to perform surgeries at SLMC.  (See 2013 First Amendment, a true and correct copy of which is attached hereto as **Exhibit 2**.)  SPD's surgeons were identified in Attachment C to the Amendment, and the terms of the Amendment permitted SPD to provide other surgeons to SLMC from time to time.  Pursuant to the Amendment, SPD had the sole and exclusive

- 1 -

DECLARATION OF GEORGE WATKINS IN SUPPORT OF SUCCESS HEALTHCARE 1, LLC'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR RIGHT TO ATTACH ORDER

396 / 467

1    responsibility for locating the surgeons for the hospital and maintaining the relationship between

2    the surgeons and SPD's surgery program.  (See Sections 1.7 and 1.8 of the First Amendment.)

3    5.        SPD constantly and aggressively would monitor SLMC's collection of payments for

4    surgeries for which SPD believed it was entitled to payment. In fact, SLMC later learned that

5    SPD was paying one of SLMC's employees as an independent contractor to share "real time"

6    with SPD the details of SLMC's receipt of payments and Explanations of Benefits.

7    6.        During the latter years of the relationship, to maintain control of the payment stream,

8    when SLMC received a check for payment for an SPD-related surgical procedure, SPD would

9    send one of its employees to take the check from SLMC and hold it ransom until SPD prepared a

10    calculation at month's end of what was owed to it and then would return the accumulated checks

11    to SLMC in exchange for payment to SPD. At first, SPD followed through on its promise and

12    returned all SLMC's checks.

13    7.        Later, however, SPD began to retain the checks that it had retrieved from SLMC and

14    refused to turn them over at the end of each month. When pressed for the payments, SPD then

15    claimed that it did not need to pay SLMC its portion of the insurance payments for 180 days

16    from the date of payment to SLMC. SPD thereafter collected – but failed to turn over – SLMC's

17    insurance payments for the period December 2016 through early August 2017. These checks

18    total more than $1.5 million. Attached as **Exhibit 3** is a schedule of the checks commandeered

19    by SPD from December 2016 until SPD's termination in July of 2017.  The third column

20    identifies checks that Bakir cashed, through his company SPD.

21    8.        To better understand the ultimate fate of checks that were never returned to SLMC, I

22    initiated an investigation to understand the ultimate fate of these missing checks.  Through my

23    investigation, I contacted the Payers that had originally provided the checks to Success so I could

24    learn about the ultimate destination of these checks.  Through my investigation, I learned that

25    SPD deposited these checks into its personal bank account at Comerica Bank.  Attached hereto

26    as **Exhibit 4** are true and correct copies of examples of some checks that were made out to Silver

27    Lake Medical Center or its owner/operator Success Healthcare 1, LLC, which show that they

28    were all deposited into the same Comerica Bank account ending in account number 3439.

- 2 -

**DECLARATION OF GEORGE WATKINS IN SUPPORT OF SUCCESS HEALTHCARE 1, LLC'S
OPPOSITION TO PLAINTIFF'S APPLICATION FOR RIGHT TO ATTACH ORDER**

1   Checks that SPD deposited into its bank account and never returned to SLMC or Success

2   Healthcare 1, LLC are identified in the schedule of checks attached as Exhibit 4.

3   9.      To be clear, there was no written agreement requiring SLMC to turn over checks to SPD

4   that SPD withheld starting in December of 2016 and it was only through pressure, harassment,

5   and duress that SPD succeeded in obtaining checks made out to SLMC. As a result of SPD's

6   refusal to return to SLMC its checks, a balance owing to SLMC quickly grew and is now $1.8

7   million.

8   10.     Notwithstanding that SPD was withholding vast amounts of money owed to SLMC under

9   the Agreement, SPD managed to continue to obtain checks from SLMC while SLMC attempted

10  to negotiate a payment plan so the parties could true up the amounts due and owing to one

11  another. I, on behalf of SLMC, and James Hopwood, the CFO of SLMC's parent company, both

12  attempted to negotiate a repayment plan with Bakir. The parties orally agreed to a repayment

13  schedule for $1,581,617.49, which included a $304,000 settlement discount.  SPD's principal

14  Brendan Bakir made the first payment from his personal checking account in February 2017.

15  Bakir later insisted that this check be returned because it would bounce, and then presented

16  SLMS with three checks that had been previously issues by payors and made out to SLMC for

17  $178,603.82. These checks were the only "payments" made by SPD to repay SLMC. Since then,

18  SPD has disavowed any agreement to repay SLMC.

19  11.     On July 19, 2017, after nearly a year of attempting to negotiate repayment of SPD's

20  growing debt, SLMC sent a Notice to Cure the Agreement and again demanded payment in a

21  good faith attempt resolve the dispute under the terms of the agreement.  The letter notified SPD

22  that SLMC would terminate the agreement if SPD did not cure the amounts owed to SLMC.

23  Instead of entering into a good faith negotiation to resolve and cure the dispute, SPD repudiated

24  its obligation to compensate SLMC for the $1,581,617.49 that SPD had previously agreed to pay.

25  Perhaps believing that a good defense is a good offense, instead of responding to the letter or

26  entering into a good faith negotiation to cure the defects identified therein, SPD filed suit in Los

27  Angeles County Superior Court.  To recover the monies owed to Success, Success filed a lawsuit

28  against SPD. (Attached hereto as **Exhibit 5** is a true and correct copy of Success's Cross-

- 3 -

**DECLARATION OF GEORGE WATKINS IN SUPPORT OF SUCCESS HEALTHCARE 1, LLC'S**
**OPPOSITION TO PLAINTIFF'S APPLICATION FOR RIGHT TO ATTACH ORDER**

1  Complaint against Surgical Program Development for the money that it misappropriated from

2  Success.)

3  12.    Mr. Bakir claims in Paragraph 7 and 8 of his Declaration that Success created a debt of

4  $847,000 as a result of alleged mismanagement of the hardware vendor program.  Mr. Bakir

5  mischaracterizes this amount as a debt that Success purportedly transferred to Mr. Bakir's

6  company, SPD.  According to the Section 3.1 of the Agreement, it was the Success's

7  responsibility on ordering the hardware parts used for the surgeries, so that the Payers would

8  know to include the hardware costs in the total reimbursement amount to the Success and its

9  hospital Silver Lake Medical Center.  Furthermore, paragraph 3.2 of the Agreement states that

10  Success was to then compensate SPD the amount of the hardware, and then as part of its billing

11  and collections services, SPD would provide payment to the hardware vendors.   Accordingly,

12  Success never created a purported $847,000 debt that it allegedly then transferred to SPD.  SPD

13  was always responsible for compensating the hardware vendors under the Agreement.

14      I declare under penalty of perjury that the foregoing is true and correct under the

15  laws of the State of California.

16      Executed this 26th day of October, 2018, at Los Angeles, California.

17

18  Date: _10·26·19_

19                                                    GEORGE WATKINS

20

21

22

23

24

25

26

27

28

- 4 -

**DECLARATION OF GEORGE WATKINS IN SUPPORT OF SUCCESS HEALTHCARE 1, LLC'S
OPPOSITION TO PLAINTIFF'S APPLICATION FOR RIGHT TO ATTACH ORDER**

# EXHIBIT 1

## COLLECTIONS AND MANAGEMENT SERVICES AGREEMENT

This collection agreement (the "Agreement"), effective JUNE  1, 2010 ("Effective Date"), is made and entered into by and between Surgical Program Development, LLC, a California limited linbility company, ("Company"), and Success Healthcare 1, LLC, a California limited liability company dba Silver Lake Medical Center ("Hospital").

### RECITALS

A.    Hospital owns and operates a general acute care hospital licensed pursuant to California Health and Safety Code Section 1250. and located at 1711 W. Temple St., Los Angeles. CA 90026.

B.    Hospital provides inpatient services to patients for which it concurrently and/or subsequently seeks payment. From time to time, Hospital may need or desire assistance in collecting payments for claims submitted to private insurance payers, Workers' funds or payers, and/or personal injury liens (collectively, "Payers", and each a "Payer"), but excluding Medi-Cal and Medicare reimbursed services, as well as other assistance in connection with the conduct of its surgical programs..

C.    Company is experienced in submitting claims for payment and collecting reimbursement from Payers for healthcare services provided by hospitals and other healthcare providers. Company is also experience in furnishing certain consulting services in connection with hospital surgical programs.

D.    Hospital desires to retain the services of Company on the terms and conditions set forth herein, to provide for the timely and cost-effective collection of certain of Hospital's claims for reimbursement from Payers for services provided by Hospital to patients ("Claims") and for certain consulting services in connection with Hospital's surgical programs, and Company desires to provide such services.

NOW, THEREFORE, in consideration of the above recitals, terms and conditions hereinafter set forth, Hospital and Company agree as follows:

1.    <u>Collection Services</u>. Hospital appoints Company as its billing agent and administrator for the purposes described in this Agreement and retains Company to provide all services reasonably necessary for collection of certain of Hospital's Claims for inpatient services, including but not limited to those for Hospital's services in connection with certain spinal or other surgery for related occupational injury or illness ("Collection Services").

1.1    <u>Claims</u>. Hospital will identify to Company all Claims relating to Hospital's inpatient services in connection with spinal surgeries for which it requests Company to provide Collection Services. Hospital may also identify inpatient Claims in addition to spinal surgery related services, for which Hospital may request Company to provide Collection Services. Hospital shall provide all information and documentation reasonably requested by Company ("Documentation") in support of such Claims. Such Documentation includes but is not limited to: a properly completed UB-92 claim form, additional invoices for implants and/or

1079700.3                                      1                    Initials: Hospital ___ Company ___

ENTERED JUN 0 8 2010

biologics, medical reports including patient history and/or physical exam, operation reports, discharge information, liens, proofs of service, and any other relevant information and/or documentation. Company shall then decide in its sole and absolute discretion whether to accept or reject such Claims for the provision of Collection Services. Notwithstanding the foregoing, Company shall not have the right to reject any Claim for which Company had assisted Hospital with the surgical case pre-authorization process.

      1.2    <u>Performance of Collection Services Generally</u>.  Company will be responsible for the performance of all Collection Services in a professional and competent manner.  Company shall regularly consult with Hospital administration concerning Collection Services.  Company shall devote the time, attention and energy necessary for the competent and effective performance of Company's duties hereunder.  Company shall comply and shall require each of its employees to comply at all times during the term of this Agreement, with all applicable state and federal statutes and regulations related to its activities.  Company shall not remove any original file without Hospital's express written authorization.  Company shall comply with all applicable laws in a manner so as not to reflect unfavorably upon Hospital or jeopardize any of Hospital's licenses, certifications or permits.  Company shall obtain and maintain in effect all licenses, certifications and permits legally required for performance of Collection Services.

         1.2.1    <u>Engagement of Third Parties</u>.  From time to time Company may, in its sole and absolute discretion, engage third parties to assist Company in performing Collection Services.  Both Parties agree to abide by the terms of the Third Party Engagement Addendum attached hereto and incorporated by reference herein as <u>Attachment A</u>.

      1.3    <u>Books and Records</u>.  Company will keep and maintain for seven (7) years from the date of termination of this Agreement, detailed books, records and other documentation, whether in written or electronic form, pertaining to its Collection Services, including notes, logs, and correspondence pertaining to beneficiaries, services rendered by Hospital, and/or Payers against whom payment is sought by Hospital.  Such obligations survive termination of this Agreement.  Company shall promptly permit Hospital to access its records relating to the Collection Services upon request.

      1.4    <u>Reports</u>.  Hospital shall, at least monthly, provide Company with a written schedule identifying the Claims it has referred to Company for Collection Services which Company has accepted ("Referred Cases"), including any amounts already collected by Hospital in connection with each Referred Case.  Company shall, at least monthly, provide Hospital with a detailed written report on the status of collection of each Referred Case containing such information as Hospital may reasonably request.

      1.5    <u>Hospital's Right to Audit Collection Services</u>.  Company shall permit Hospital to audit, within a reasonable time of its request and during normal business hours, Company's reports submitted pursuant to the requirements of this Agreement.  Company shall cooperate with any compliance program established by Hospital during the term hereof, including without limitation, giving Hospital and its representatives access to all claim records, data information, and software required by Hospital or Hospital's authorized agent who performs

10797003                    2              *Initials: Hospital* ___  *Company* ___

such audit. Hospital may challenge any invoice submitted by Company within a reasonable time of receipt thereof.

1.6 Company's Right to Audit Hospital Collections. Hospital shall permit Company to audit, within a reasonable time of its request and during normal business hours, Hospital's reports submitted pursuant to the requirements of this Agreement. Hospital shall cooperate with any such audit, including without limitation, giving Company and its representatives access to all claim records, data information, and software required by Company or Company's authorized agent who performs such audit.

2. Hospitals' Duties.

2.1 New Vendors. Prior to entering into any agreements, or other financial relationships, with any new vendors relating to spinal surgeries, including but not limited to advertisers, marketers, Durable Medical Equipment suppliers ("Vendors"), Hospital will give Company thirty (30) days written notice of such proposed relationship. Company will investigate and review such vendors for issues such as regulatory compliance, reputation, and relationships with other hospitals. Company will report its findings and recommendations to the Hospital. Hospital is not bound by such recommendations.

2.2 Negotiation and Settlement of Claims. Company shall have the sole authority to negotiate the resolution of Referred Cases with Payers. Company shall obtain Hospital's approval, which shall not be unreasonably withheld, for any settlement of a Claim in an amount that is less than the amount that the Hospital would reasonably have expected to receive from the Payer.

2.3 Negotiations with Payers. Hospital may negotiate with Payers regarding matters other than the settlement of Referred Cases. Hospital shall notify company of any negotiations with Payers and seek Company input regarding the effects such negotiations may have on different programs.

3. Guaranteed Minimum Collection and Compensation.

3.1 Separate Itemization of Hardware. The bills submitted by Company on behalf of Hospital for the Referred Cases will separately itemize the hardware used in the case apart from the other items and services furnished by Hospital. The parties hereto anticipate that the amount paid by the Payers for the hardware will be separately identified by the Payers apart from the amount paid for other items and services. Hardware (the "Hardware") includes any implantable device implanted in the patient during the surgical procedure, such as screws, cages and rods. The amount of the payment made by or on behalf of a Payer for the Hardware is referred to hereinafter as the "Hardware Payment." The amount of payment made by or on behalf of a Payer for all other items or services is referred to hereinafter as the "DRG Payment." The DRG Payment includes all amounts paid by or on behalf of the Payer for items and services other than Hardware whether paid in a single payment or in multiple payments, and whenever and however made, including without limitation all amounts paid for such items or services as part of a settlement of a Referred Case.

3.2    Compensation.    In consideration for Company's Collection Services rendered to or on behalf of Hospital, and other services furnished by Company to Hospital under this Agreement, Hospital shall pay Company for each Referred Case the amount, if any, by which the sum of (a) the amounts paid to the Hospital for the Referred Case by or on behalf of the Payer, whenever paid, plus (b) all payments, if any, made by Company to Hospital for the Referred Case under paragraph 3.4 hereof, exceeds the sum of (x) the amount paid or payable by Hospital for the Hardware, plus (y) the DRG Guarantee as defined below (the "Compensation"). The Compensation shall be paid to Company within five (5) days of receiving payments from the Payer.

3.3    Minimum Guaranteed Collection.    Company guarantees that the amount of the DRG Payment for each Referred Case will be no less than fifty percent (50%) of the Hospital's published Medicare Diagnosis Related Group ("DRG") value of the Referred Case in effect on the date of the patient's discharge ("DRG Guarantee").

3.4    Payment of DRG Guarantee.    For each Referred Case, Company and Hospital shall determine the amount, if any, by which the DRG Guarantee exceeds the DRG Payment, if any, as of the 90th day after Company's receipt from Hospital of a properly completed UB-92 billing form (the "Determination Date"), or any successor form, for the Referred Case (the "Shortfall"). Company shall pay Hospital the amount of the Shortfall on or before the tenth (10th) day following the Determination Date.

3.5    Continual Obligation.    The amount of the Compensation for a Referred Case shall be recomputed each time a payment is received by Hospital for the Referred Case, and the amount of the Compensation that has not previously been paid by Hospital to Company shall paid by Hospital to Company within five (5) days after receiving any payment for the Referred Case. This provision and paragraph 3.4 shall survive termination of this Agreement.

3.6    No Payment to Company.    No payment shall be made to Company for any Collection Services, and Company shall have no rights with respect to any Referred Case, unless and until monies are actually paid by a Payer or anyone on such Referred Cases and received by Hospital. Hospital is not obligated to pay any other fees or costs to Company, including any expert/witness fees, attorneys' fees, interest, or filing fees required for Company to effectively perform its Collection Services. All payments by Payers or others with respect to a Referred Case are to be made payable solely to "Success Healthcare 1, LLC" or as Hospital may otherwise direct in writing and are to be delivered to Hospital directly, and not to Company. All settlements and orders for payment of Claims must reflect that payment shall be made solely to "Success Healthcare, 1 LLC" or as Hospital may otherwise direct in writing and are to be delivered to Hospital directly.

4.    Term, Renewal and Termination.

4.1    Term.    The initial term of this Agreement shall be for a period of one (1) year, commencing on the Effective Date unless it is terminated sooner, as set forth below. Thereafter, the term of this Agreement shall automatically renew for successive one (1) year periods unless earlier terminated by the parties in accordance with this Agreement.

1079700.3                          4                 Initials: Hospital _____ Company _____

404 / 467

**4.2    Mutual Termination.** This Agreement may be terminated at any time upon the written mutual consent of the parties.

**4.3    Termination Without Cause.** Either party may terminate this Agreement without cause upon giving ninety (90) days written notice to the other party.

**4.4    Termination With Cause.** In the event of a material breach of this Agreement, the non-breaching party may terminate this Agreement by giving the breaching party at least thirty (30) days prior written notice.

**4.4.1    Notice and Cure.** Any termination notice given for cause pursuant to Section 4.4 above shall be accompanied by a notice of defects specifying any defects arising under this Agreement and shall include suggested methods for curing such defects. The party receiving such notice of defects shall have ten (10) business days from the receipt of the same to cure such defects, if curable, except that If such defect cannot reasonably be cured within such ten-day period and the party has diligently commenced to cure such defect promptly within such ten-day period, such ten-day period shall be extended for such reasonable period as it shall require the breaching party, in the exercise of due diligence, to cure such defect, provided, however, that in no event shall this period be extended for more than thirty (30) days . If the defects have been cured at the end of this ten (l0) business day period, or if the defects have been cured within such reasonable period as required in the exercise of due diligence, the termination notice which accompanied the notice of defects shall be rendered inoperative and shall be null and void.

**4.5    Effect of Termination.** Upon termination of this Agreement, Company shall continue to perform Collection Services for the Referred Cases currently assigned to Company at such time, until (a) Hospital has received payment from the Payer for the Referred Case in the maximum amount Company determines the Payer will likely pay for the case, (b) an Order to Pay Lien (or similar court order) has been entered, or a settlement agreement has been executed by all parties, (c) one hundred twenty (120) days has passed since Company accepted the Referred Case, or (d) Hospital withdraws such Referred Case(s) pursuant to Section 5 below, whichever comes first. For all Referred Cases continuing beyond termination, other than those withdrawn pursuant to Section 5, all provisions of Section 3 shall survive termination and continue to be in effect as applicable.

**4.6    Return of Documentation.** Upon termination of this Agreement and completion of any outstanding Referred Cases pursuant to Section 4.5, Company shall return to Hospital, without assessment of any fees, charges or penalties, all books, files, records, correspondence and all other Documentation (whether electronically or manually generated or stored) related to any Referred Cases, including but not limited to all information supplied to Company by Hospital.

**5.    Withdrawal by Hospital or Return by Company of Referred Cases.**

**5.1    Withdrawal.** Hospital may withdraw a Referred Case from Company if such Referred Case is subject to litigation or either party has terminated the Agreement pursuant

to Section 4. Hospital must notify Company, in writing, to stop its efforts and return its files pertaining to such accounts.

    5.2    Return. Company may return a Referred Case to Hospital if Company has terminated the Agreement for cause or Hospital has terminated the Agreement.

    5.3    Effect of Withdrawal or Return. In the event that Hospital withdraws a Referred Case from Company or Company returns a Referred Case to Hospital, the provisions of Section 3 shall not apply. Instead, Hospital shall pay Company fifty percent (50%) of any amount actually paid to Hospital by Payers or others in relation to such Referred Case within five (5) business days of receiving such payment. Company shall not owe to Hospital the DRG Guarantee, or any portion thereof, for such withdrawn Referred Cases.

    5.4    Return of Documentation. Upon Hospital withdrawing any Referred Cases from, Company shall return to Hospital, without assessment of any fees, charges or penalties, all books, files, records, correspondence and all other Documentation (whether electronically or manually generated or stored) related to the Referred Cases, including but not limited to all information supplied to Company by Hospital.

    5.5    Substitutions. Within five (5) business days of withdrawal or return of a Referred Case, Company shall cooperate with the preparation of, and promptly sign all substitutions of attorney/representative that may be necessary, substituting Hospital or its designee, into each Referred Case that is withdrawn. Any authorizations for representation shall be void and ineffective upon withdrawal. Company shall also provide Hospital with an accurate calendar of all future dates that have been scheduled for appearance, hearing, or other action in cases in which Company represented Hospital within a sufficient amount of time for Hospital to arrange to send a representative to hearings and appearances

    6.    No Contract Authority. Nothing contained in this Agreement is intended to, nor shall it be construed to, confer upon Company any authority to enter into any contract or agreement affecting or binding Hospital without first obtaining Hospital's written consent, other than typical stipulations entered into regarding settlement of Claims in the course of performing Collection Services.

    7.    Settlement Authority. Company shall have the full authority to settle any Referred Case on such terms as Company in its sole discretion shall determine. Hospital hereby appoints Company its attorney-in-fact for the purposes of negotiating and entering into settlements of Referred Cases on behalf of Hospital.

    8.    Cooperation with Compliance Efforts of Hospital. Company agrees to cooperate with Hospital as necessary so that Hospital and Company meet all requirements imposed by law or ordinance or established by the rules and regulations of any federal, state or local agency, department, commission, association or other governing or advisory body having authority to set standards governing the operation of Hospital and the activities of Company.

    9.    Independent Contractor.

1079700.3            6            *Initials: Hospital* ___ *Company* ___

9.1    No Relationship.    No relationship of employee or employer is created by this Agreement. It is understood by the parties to this Agreement that Company, its employees, agents, and representatives shall act hereunder as independent contractors and in no other relationship to either Hospital or its management company. Neither Company nor its employees, agents or representatives shall have any claim under this Agreement or otherwise against Hospital for any benefits usually associated with employment, including, but not limited to: vacation pay, sick leave, retirement benefits, Social Security benefits, workers' compensation benefits, insurance coverage, unemployment compensation benefits, or any other employee-type benefits whatsoever. Hospital shall neither have nor exercise control or direction over the methods or materials by which Company and/or its personnel perform their work and functions. Company and/or its personnel shall perform their work and functions, at all times, in strict accordance with the currently approved methods and practices in their field, and the sole interest of Hospital is to ensure that said Collection Services are performed in a competent, efficient, legal, and satisfactory manner in accordance with standards reasonably required by the Hospital. Company shall maintain throughout the term hereof workers' compensation insurance coverage for each of its employees and provide Hospital with proof of coverage upon request.

9.2    Collection Services Costs.    Company is solely responsible for all costs and expenses associated with Collection Services, including filing fees, travel expenses, appearance fees, faxes, penalties, photocopying, messenger fees, postage, telephone, secretarial services, insurance, equipment, maintenance and supplies, legal services, clerical services, representative fees, the engagement of third parties, and the like.

10.    Compliance.

10.1    HIPAA.    Company agrees to comply with the applicable provisions of the Administrative Simplification section of HIPAA, as codified at 42 U.S.C. § 1320d through d-8 ("HIPAA"), and the requirements of any regulations promulgated thereunder including, without limitation, the federal privacy regulations as contained in 45 C.F.R. Part 142 (collectively, the "Regulations"). Company agrees not to use or further disclose any protected health information, as defined in 45 C.F.R. § 160.103 and/or 45 C.F.R. § 164.504, or individually identifiable health information, as defined in 42 U.S.C. § 1320d (collectively, the "Protected Health Information"), concerning any patient of Hospital other than as permitted by this Agreement and the requirements of HIPAA or the Regulations. Company will implement appropriate safeguards to prevent the use or disclosure of Protected Health Information other than as contemplated by this Agreement. Company will promptly report to Hospital any use or disclosure, of which Company becomes aware, of Protected Health Information in violation of HIPAA or the Regulations. In the event that Company contracts with any agents to whom Company provides Protected Health Information, Company shall include provisions in such agreements pursuant to which Company and such agents agree to the same restrictions and conditions that apply to Company with respect to Protected Health Information. Company will make its internal practices, books and records relating to the use and disclosure of Protected Health Information available to the Secretary of the United States Department of Health and Human Services to the extent required for determining compliance with HIPAA and the Regulations.

10.2    Business Associate Addendum. Company agrees to abide by the terms of the HIPAA Business Associate Addendum attached hereto and incorporated by reference herein as Attachment B.

10.3    Access to Books and Records.

10.3.1 Required Access for "Secretary" and "Comptroller General." Company shall make available, upon written request from the Secretary of the United States Department of Health and Human Services (the "Secretary"), or upon the request from the Comptroller General of the United States General Accounting Office (the "Comptroller General"), or any of their duly authorized representatives, respectively, a copy of this Agreement and such books, documents, and records as are necessary to verify the nature and extent of the costs of the services provided by Company under this Agreement. Company further agrees that if Company carries out any of its duties under this Agreement through a subcontract with a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period with an agent, such contract shall contain a clause to the effect that the agent shall make available, upon request from the Secretary, or upon request from the Comptroller General, or any of their duly authorized representatives, respectively, a copy of such contract and such books, documents, and records as are necessary to verify the nature and extent of such costs. The availability of Company's books, documents and records shall be subject at all times to all applicable legal requirements, including, without limitation, such criteria and procedures for seeking and obtaining access that may be promulgated by the Secretary in federal regulations.

10.3.2 Required Access for Hospital. Company shall provide Hospital with all information, records and any other documents related to the performance of Collection Services hereunder, and shall promptly, at Hospital's request, provide Hospital with copies of any books, documents, and records released to the Secretary or Comptroller General pursuant to this Section.

10.4    Survival. The rights of the Secretary and Comptroller General and the rights of Hospital pursuant to this Section shall survive the expiration or other termination of this Agreement.

11.    Fair Value Warranty. Each party represents and warrants on behalf of itself, that the aggregate benefit given or received under this Agreement has been determined in advance through a process of arms-length negotiations that were intended to achieve an exchange of goods and/or services consistent with fair market value under the circumstances, and that any benefit given or received under this Agreement is not intended to induce, does not require, and is not contingent upon, the admission, recommendation or referral of any patient, directly or indirectly, and further, is not determined in any manner that takes into account the value of business generated between the parties.

12.    Assignment.

12.1    No Assignment of Claims. Nothing contained in this Agreement is intended to, nor shall it be construed to, constitute an assignment by Hospital to Company of any Claim or account receivable, which will remain the sole property of Hospital.

1079700.3                                    8                    Initials: Hospital _____ Company _____

12.2    Assignment of Collection Services.  Company, in its sole and absolute discretion, may assign its Collection Service duties to a third party.

13.    Notices.  Required notices shall be in writing.  These notices shall be deemed given when personally delivered, the next business day after deposit with a nationally recognized overnight carrier, and the third business day after deposit in the Unites States mail, certified, and with proper postage prepaid, and shall also be delivered via facsimile, addressed as follows:

If to Hospital:
Success Healthcare 1, LLC
999 Yamato Road, Third Floor
Boca Raton, FL 33431
Attention: Steve Popkin, CEO

If to Company:
Surgical Program Development, LLC
18000 Studebaker Road, Suite 330
Cerritos, California 90703
Attention: Brendan Bakir

With a Copy to:
[Attorney]

With a Copy to:
Lloyd Bookman, Esq.
Hooper, Lundy & Bookman, Inc.
1875 Century Park East, Suite 1600
Los Angeles, CA 90067

Any party may change its address or contact information for the purpose of receiving notices, demands. or other communications provided herein by giving a written notice in the manner stated above to the other party or parties stating such change of address.

14.    No Implied Waiver of Breach.  Any waiver of any term and condition hereof must be in writing and signed by the party against whom it is asserted.  A party's neglect or failure in any case or circumstance to require performance of the other party's obligations or to enforce its rights in the event of a breach by the other party shall not affect such party's right to enforce such rights and obligations in any other case or circumstance.  A waiver of any individual term or condition shall not be construed as a waiver of any other term or condition nor, unless so provided in such written waiver, of the term or condition thereby waived in the event of a future or continuing breach by the other party, except in the particular circumstance(s) in or for which such waiver was provided.

15.    Succession.  This Agreement applies to, inures to the benefit of and binds all parties hereto, their heirs, devisees, legatees, executors, administrators, representatives, successors and assigns.

16.    Amendment.  This Agreement may only be amended in a writing signed by authorized representatives of the parties hereto.

17.    Further Acts.  At any time after execution of this Agreement, the parties shall sign and deliver. or cause others to do so, all such documents and instruments or do or cause to be done all such acts and things reasonably necessary to carry out the provisions of this Agreement.

10797003                                    9                    Initials: Hospital _____ Company _____

17.1    Venue. The parties agree that the County of Los Angeles, California shall be the only proper venue for disputes related to this Agreement, including arbitration.

18.    Disputes/Arbitration. Upon the request of either party, any controversy or claim (whether such claim sounds in contract, tort or otherwise) arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration in accordance with California Code of Civil Procedure Sections 1280 *et seq.*, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. An arbitrator shall be selected from JAMS and the arbitration shall be conducted in accordance with JAMS' current rules for streamlined arbitration. Notwithstanding any other provision of this Agreement, in the case of a dispute involving a claim for equitable relief, a court with equitable jurisdiction may grant temporary restraining orders and preliminary injunctions to preserve the status quo existing before the events which are the subject of the dispute. Any final equitable or other relief shall be ordered in the arbitration proceeding. Each party shall pay an equal share of the fees and expenses of any arbitrator and any administrative fee of JAMS. Each party shall be responsible for its own attorneys' fees and costs.

Initials: Hospital ___  Company ___

19.    Severability. Should any one or more provisions of this Agreement be determined to be invalid or void, the balance of the provisions shall, nevertheless, remain in full force and effect.

20.    Time is of the Essence. Time is strictly of the essence under this Agreement and any amendment, modification or revision hereof.

21.    Confidentiality. The terms of this Agreement and all matters relating to billings of Hospital for services rendered to Hospital's patients are confidential and shall not be disclosed without the prior written approval of Hospital. Company shall implement policies and procedures satisfactory to Hospital that are designed to protect and preserve the confidential nature of the information it receives from Hospital and receives in the course of providing Collection Services, and shall provide Hospital with copies thereof.

22.    Authorized Signatory. Each individual executing this Agreement on behalf of an entity represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of each respective entity in accordance with the governing and/or formation documents of said entity, and that all representations and warranties contained in this Agreement, or any documents referenced in this Agreement, are true and correct.

23.    Independent Counsel. Each party who is a signatory to this Agreement hereby acknowledges that he or it has had the opportunity to be represented by independent counsel of his or its own choice throughout all of the negotiations which preceded the execution of this Agreement, and that he or it has executed this Agreement freely, voluntarily and without any coercion whatsoever, with the consent and upon the advice of such independent counsel, or having knowingly waived the opportunity to obtain such advice. Each party further acknowledges that both he or it and his or its counsel, if any, have had adequate opportunity to make whatever investigation or inquiry deemed necessary or desirable in connection with the

subject matter of this Agreement prior to the execution hereof and the delivery and acceptance of the considerations specified herein and that each of them has reviewed such documents and information that he or it deems necessary or appropriate concerning this Agreement. Each Party hereto acknowledges that this Agreement has been drafted as a result of negotiations between the parties, and that its terms and provisions should be interpreted in accordance with their fair meaning and not in favor or against any one party.

24.    **Entire Agreement.**  This Agreement and the schedules and exhibits attached hereto constitute the entire agreement of the parties with respect to the subject matter hereof, and supersedes all prior understandings or agreements, whether written or oral, with respect to the subject matter hereof.

25.    **Third Party Rights.**  This Agreement shall not be construed as conferring upon any third party any right or benefit, and any and all claims that may arise hereunder may be enforced solely by Hospital or by Company.

26.    **Change in Law.**  The parties recognize that this Agreement is subject to applicable Federal, state, and local laws, rules and regulations now or hereafter in effect, and shall be subject to amendments of such laws, rules and regulations (collectively, "Law"). If the Law is amended or changed or existing or amended Law is interpreted by judicial decision, announcement, an action letter, safe harbor provision, order or decision of a regulatory agency, or is read to provide, that the structure or substance of any part of this Agreement (a) is in violation of the Law or (b) may subject a party to this Agreement, or any affiliate of that party, or an employee, agent or director or trustee of any party to this Agreement or of any affiliate thereof to a significant and substantial risk of financial loss or penalty or criminal prosecution, then the Law shall be deemed to have superseded the terms of this Agreement, and either party shall be entitled to modify or terminate this Agreement immediately upon notice to the other party. Modifications to this Agreement made pursuant to this Section are limited to those modifications determined to be necessary to comply with a change of Law or other event described in this Section and, to the greatest extent possible, any such modifications shall preserve the terms and intent of this Agreement. If either party does not agree with such modifications, such party shall have the right to terminate this Agreement upon thirty (30) days' advance written notice to the other.

27.    **Force Majeure.**  Neither party shall be liable nor deemed to be in default for any delay or failure in performance under this Agreement or other interruption of service deemed resulting, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation, machinery or supplies, vandalism, strikes or other work interruptions beyond the reasonable control of either party. However, both parties shall make good faith efforts to perform under this Agreement in the event of any such circumstances.

28.    **Incorporation of Recitals and the Exhibits.**  All recitals and the exhibits referred to in this Agreement are an integral part of this Agreement. They are incorporated in this Agreement by this reference as though at this point set forth in full.

10792003                          11            *Initials: Hospital* ___  *Company* ___

29.    Further Assurances.  Each party hereto shall furnish such information, execute such documents and take such action as the other party(ies) reasonably may request for the purpose of carrying out the intent of this Agreement.

30.    Meaning of Certain Words.  Wherever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms and the singular form of nouns shall include the plural and vice versa.  References to days in this Agreement shall mean calendar days, unless otherwise specified.

31.    Headings.  The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

32.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Remainder of page intentionally left blank]*

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first written above.

EACH OF THE UNDERSIGNED HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS CONTAINED IN THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, ALL WAIVERS CONTAINED IN THIS AGREEMENT, AND EACH INDIVIDUAL SIGNING THIS AGREEMENT IS AUTHORIZED BY EACH ENTITY WHOSE NAME APPEARS ABOVE HIS/HER NAME TO ENTER INTO THIS AGREEMENT ON ITS BEHALF.

**HOSPITAL**
Success Healthcare 1, LLC
dba Silver Lake Medical Center

By: _____
Name: Steve Popkin, CEO
Date:

**COMPANY**
Surgical Program Development, LLC

By: _____
Name: Brendan Baur, CEO
Date:

1079700.3                                  13                    *Initials: Hospital ____ Company ____*

**Attachment A**

**THIRD PARTY ENGAGEMENT ADDENDUM**

This Third Party Engagement Addendum ("Addendum") supplements and is made a part of the agreement ("Agreement") by and between Success Healthcare 1, LLC dba Silver Lake Medical Center ("Hospital") and Surgical Program Development, LLC ("Company"), dated _____ ___, 2010. This Addendum is effective as of the date of the Agreement ("Addendum Effective Date").

1.      From time to time Company may, in its sole and absolute discretion, engage third parties to assist Company in performing Collection Services, as defined in the Agreement.

2.      Company is solely responsible for all costs and expenses associated with engaging such third parties.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum as of the Addendum Effective Date.

**HOSPITAL**
Success Healthcare 1, LLC
dba Silver Lake Medical Center

By: _____
Name: Steve Papkin, CEO
Date:

**COMPANY**
Surgical Program Development, LLC

By: _____
Name: Brendan Bukir, CEO
Date:

10797003                                    1                    *Initials: Hospital* ___ *Company* ___

Attachment B

## HIPAA BUSINESS ASSOCIATE ADDENDUM

This Business Associate Addendum ("Addendum") supplements and is made a part of the contract ("Contract") by and between Success Healthcare 1, LLC dba Silver Lake Medical Center ("Covered Entity" or "CE") and Surgical Program Development, LLC ("Business Associate" or "BA"), dated ___ ___, 2010.  This Addendum is effective as of the date of the Contract ("Addendum Effective Date").

A.  CE wishes to disclose certain information to BA pursuant to the terms of the Contract, some of which may constitute Protected Health Information ("PHI") (defined below).

B.  CE and BA intend to protect the privacy and provide for the security of PHI disclosed to BA pursuant to the Contract in compliance with the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act, Public Law 111-005 ("HITECH Act"), and regulations promulgated thereunder by the U.S. Department of Health and Human Services ("HIPAA Regulations") and other applicable laws.

C.  As part of the HIPAA Regulations, the Privacy Rule and the Security Rule (defined below) require CE to enter into a contract containing specific requirements with BA prior to the disclosure of PHI (defined below), as set forth in, but not limited to, Title 45, Sections 164.314(a), 164.502(e) and 164.504(e) of the Code of Federal Regulations ("C.F.R.") and contained in this Addendum.

In consideration of the mutual promises below and the exchange of information pursuant to this Addendum, CE and BA agree as follows:

1. Definitions

a.  Breach shall have the meaning given to such term under 42 U.S.C. § 17921(1) and 45 C.F.R. § 164.402.

b.  Business Associate shall have the meaning given to such term under 42 U.S.C. § 17938 and 45 C.F.R. § 160.103.

c.  Covered Entity shall have the meaning given to such term under 45 C.F.R. § 160.103.

d.  Data Aggregation shall have the meaning given to such term under 45 C.F.R. § 164.501.

e.  Designated Record Set shall have the meaning given to such term 45 C.F.R. § 164.501.

f.  Electronic Protected Health Information or EPHI means Protected Health Information that is maintained in or transmitted by electronic media.

g.  Electronic Health Record shall have the meaning given to such term under 42 U.S.C. § 17921(5).

h.  Health Care Operations shall have the meaning given to such term under 45 C.F.R. § 164.501.

i.    **Privacy Rule** shall mean the HIPAA Regulation that is codified at 45 C.F.R. Parts 160 and 164, Subparts A and E.

j.    **Protected Health Information or PHI** means any information, whether oral or recorded in any form or medium: (i) that relates to the past, present or future physical or mental condition of an individual; the provision of health care to an individual; or the past, present or future payment for the provision of health care to an individual; and (ii) that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual, and shall have the meaning given to such term under 45 C.F.R. § 160.103. PHI includes EPHI.

k.    **Protected Information** shall mean PHI provided by CE to BA or created or received by BA on CE's behalf.

l.    **Security Rule** shall mean the HIPAA Regulation that is codified at 45 C.F.R. Parts 160 and 164, Subparts A and C.

m.    **Unsecured PHI** shall have the meaning given to such term under 42 U.S.C. § 17932(h), 45 C.F.R. § 164.402 and guidance issued pursuant to the HITECH Act including, but not limited to that issued on April 17, 2009 and published in 74 Federal Register 19006 (April 27, 2009), by the Secretary of the U.S. Department of Health and Human Services ("Secretary").

2.    **Obligations of Business Associate**

a.    **Permitted Uses.** BA shall not use Protected Information except for the purpose of performing BA's obligations under the Contract and as permitted under the Contract and Addendum. Further, BA shall not use Protected Information in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so used by CE. BA may use Protected Information (i) for the proper management and administration of BA, (ii) to carry out the legal responsibilities of BA, or (iii) for Data Aggregation purposes for the Health Care Operations of CE.

b.    **Permitted Disclosures.** BA shall not disclose Protected Information except for the purpose of performing BA's obligations under the Contract and as permitted under the Contract and Addendum. BA shall not disclose Protected Information in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so disclosed by CE. However, BA may disclose Protected Information (i) for the proper management and administration of BA; (ii) to carry out the legal responsibilities of BA; (iii) as required by law; or (iv) for Data Aggregation purposes for the Health Care Operations of CE. If BA discloses Protected Information to a third party, BA must obtain, prior to making any such disclosure, (i) reasonable written assurances from such third party that such Protected Information will be held confidential as provided pursuant to this Addendum and only disclosed as required by law or for the purposes for which it was disclosed to such third party, and (ii) a written agreement from such third party to immediately notify BA of any breaches of confidentiality of the Protected Information, to the extent it has obtained knowledge of such breach.

c.    **Prohibited Uses and Disclosures under HITECH.** Notwithstanding any other provision in this Addendum, BA shall comply with the following requirements: (i) BA shall not use or disclose Protected Information for fundraising or marketing purposes, except as provided under the Contract and consistent with the requirements of 42 U.S.C. § 17936; (ii) BA shall not disclose Protected Information to a health plan for payment or health care operations purposes if the patient has requested this special restriction, and has paid out of

pocket in full for the health care item or service to which the PHI solely relates, 42 U.S.C. § 17935(a); (iii) BA shall not directly or indirectly receive remuneration in exchange for Protected Information, except with the prior written consent of CE and as permitted by the HITECH Act, 42 U.S.C. §17935(d)(2); however, this prohibition shall not affect payment by CE to BA for services provided pursuant to the Contract.

d.   **Appropriate Safeguards.** BA shall implement appropriate safeguards as are necessary to prevent the use or disclosure of Protected Information other than as permitted by the Contract or Addendum. BA shall use administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of EPHI. BA shall comply with each of the requirements of 45 C.F.R. §§ 164.308, 164.310, and 164.312 and the policies and procedures and documentation requirements of the HIPAA Security Rule set forth in 45 C.F.R. § 164.316.

e.   **Mitigation.** BA shall mitigate, to the extent practicable, any harmful effect that is known to BA of a use or disclosure of PHI in violation of this Addendum.

f.   **Reporting of Improper Access, Use or Disclosure.** BA shall promptly report to CE in writing of any access, use or disclosure of Protected Information not permitted by the Contract and Addendum or applicable law and any security incident, as defined in the Security Rule, of which it becomes aware. BA shall, following the discovery of any Breach of Unsecured PHI, notify CE in writing of such breach without unreasonable delay and in no case later than three (3) business days after discovery. The notice shall include the following information if known (or can be reasonably obtained) by BA: (i) contact information for the individuals who were or who may have been impacted by the Breach (e.g., first and last name, mailing address, street address, phone number, email address); (ii) a brief description of the circumstances of the Breach, including the date of the Breach and date of discovery (as defined in 42 U.S.C. § 17932(c)); (iii) a description of the types of Unsecured PHI involved in the Breach (e.g., names, social security numbers, date of birth, addresses, account numbers of any type, disability codes, diagnostic and/or billing codes and similar information); (iv) a brief description of what the BA has done or is doing to investigate the Breach, mitigate harm to the individuals impacted by the Breach. BA shall pay the actual, reasonable costs of CE to provide required notifications.

g.   **Business Associate's Subcontractors and Agents.** BA shall ensure that any agents or subcontractors to whom it provides Protected Information agree in writing to the same restrictions and conditions that apply to BA with respect to such PHI. To the extent that BA creates, maintains, receives or transmits EPHI on behalf of the CE, BA shall implement the safeguards required by paragraph 2.d above with respect to EPHI.

h.   **Access to Protected Information.** To the extent BA maintains a Designated Record Set on behalf of the CE, BA shall make Protected Information maintained by BA or its agents or subcontractors in Designated Record Sets available to CE for inspection and copying within fifteen (15) days of a request by CE to enable CE to fulfill its obligations under the Privacy Rule, including, but not limited to, 45 C.F.R. § 164.524. If BA maintains an Electronic Health Record, BA shall provide such information in electronic format to enable CE to fulfill its obligations under the HITECH Act, including, but not limited to, 42 U.S.C. § 17935(e).

i.   **Amendment of PHI.** To the extent BA maintains a Designated Record Set on behalf of CE, within thirty (30) days of receipt of a request from the CE or an individual for an amendment of Protected Information or a record about an individual contained in a Designated Record Set, BA or its agents or subcontractors shall make any amendments that CE directs or agrees to in accordance with the Privacy Rule.

j. **Accounting Rights.** Within thirty (30) days of notice by CE of a request for an accounting of disclosures of Protected Information, BA and its agents or subcontractors shall make available to CE the information required to provide an accounting of disclosures to enable CE to fulfill its obligations under the Privacy Rule, including, but not limited to, 45 C.F.R. § 164.528, and its obligations under the HITECH Act, including but not limited to 42 U.S.C. § 17935(c), as determined by CE. The provisions of this subparagraph 2.j shall survive the termination of this Addendum.

k. **Governmental Access to Records.** BA shall make its internal practices, books and records relating to the use and disclosure of Protected Information available to CE and to the Secretary for purposes of determining BA's compliance with the Privacy Rule.

l. **Minimum Necessary.** BA (and its agents or subcontractors) shall request, use and disclose only the minimum amount of Protected Information necessary to accomplish the purpose of the request, use or disclosure. Because the definition of "minimum necessary" is in flux, BA shall keep itself informed of guidance issued by the Secretary with respect to what constitutes "minimum necessary."

## 3. Termination

a. **Material Breach by BA.** A breach by BA of any provision of this Addendum, as determined by CE, shall constitute a material breach of the Contract and shall provide grounds for termination of the Contract, any provision in the Contract to the contrary notwithstanding, with or without an opportunity to cure the breach. If termination of the Contract is not feasible, CE will report the problem to the Secretary.

b. **Material Breach by CE.** Pursuant to 42 U.S.C. § 17934(b), if the BA knows of a pattern of activity or practice of the CE that constitutes a material breach or violation of the CE's obligations under the Contract or Addendum or other arrangement, the BA must take reasonable steps to cure the breach or end the violation. If the steps are unsuccessful, the BA must terminate the Contract or other arrangement if feasible, or if termination is not feasible, report the problem to the Secretary.

c. **Effect of Termination.** Upon termination of the Contract for any reason, BA shall, at the option of CE, return or destroy all Protected Information that BA or its agents or subcontractors still maintain in any form, and shall retain no copies of such Protected Information. If return or destruction is not feasible, as determined by CE, BA shall continue to extend the protections of Section 2 of this Addendum to such information, and limit further use of such PHI to those purposes that make the return or destruction of such PHI infeasible. If CE elects destruction of the PHI, BA shall certify in writing to CE that such PHI has been destroyed.

4. **Indemnification; Limitation of Liability.** To the extent permitted by law, BA shall indemnify, defend and hold harmless CE from any and all liability, claim, lawsuit, injury, loss, expense or damage resulting from or relating to the acts or omissions of BA in connection with the representations, duties and obligations of BA under this Addendum. Any limitation of liability contained in the Contract shall not apply to the indemnification requirement of this provision. This provision shall survive the termination of the Addendum.

5. **Assistance in Litigation.** BA shall make itself and any subcontractors, employees or agents assisting BA in the performance of its obligations under the Contract or Addendum available to CE, at no cost to CE, to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings being commenced against CE, its directors, officers or employees based upon a claim of violation of

HIPAA, the HITECH Act, or other laws related to security and privacy, except where BA or its subcontractor, employee or agent is named as an adverse party.

6. **Amendment to Comply with Law.** Because state and federal laws relating to data security and privacy are rapidly evolving, amendment of the Contract or Addendum may be required to provide for procedures to ensure compliance with such developments. BA and CE shall take such action as is necessary to implement the standards and requirements of HIPAA, the HITECH Act, the Privacy Rule, the Security Rule and other applicable laws relating to the security or confidentiality of PHI. BA shall provide to CE satisfactory written assurances that BA will adequately safeguard all Protected Information. Upon the request of either party, the other party shall promptly enter into negotiations concerning the terms of an amendment to this Addendum embodying written assurances consistent with the standards and requirements of HIPAA, the HITECH Act, the Privacy Rule, the Security Rule or other applicable laws. CE may terminate the Contract upon thirty (30) days written notice in the event (i) BA does not promptly enter into negotiations to amend the Contract or Addendum when requested by CE pursuant to this Section or (ii) BA does not enter into an amendment to the Contract or Addendum providing assurances regarding the safeguarding of PHI that CE, in its sole discretion, deems sufficient to satisfy the standards and requirements of applicable laws.

7. **No Third-Party Beneficiaries.** Nothing express or implied in the Contract or Addendum is intended to confer, nor shall anything herein confer upon any person other than CE, BA and their respective successors or assigns, any rights, remedies, obligations or liabilities whatsoever.

8. **Interpretation.** The provisions of this Addendum shall prevail over any provisions in the Contract that may conflict or appear inconsistent with any provision in this Addendum. This Addendum and the Contract shall be interpreted as broadly as necessary to implement and comply with HIPAA, the HITECH Act, the Privacy Rule and the Security Rule. Any ambiguity in this Addendum shall be resolved in favor of a meaning that complies and is consistent with HIPAA, the HITECH Act, the Privacy Rule and the Security Rule. Except as specifically required to implement the purposes of this Addendum, or to the extent inconsistent with this Addendum, all other terms of the Contract shall remain in force and effect.

9. **Regulatory References.** A reference in this Addendum to a section of regulations means the section as in effect or as amended, and for which compliance is required.

10. **Identity Theft Program Compliance.** To the extent that CE is required to comply with the final rule entitled "Identity Theft Red Flags and Address Discrepancies under the Fair and Accurate Credit Transactions Act of 2003," as promulgated and enforced by the Federal Trade Commission (16 C.F.R. Part 681) ("Red Flags Rule"), and to the extent that BA is performing an activity in connection with one or more "covered accounts," as that term is defined in the Red Flags Rule, pursuant to the Contract, BA shall establish and comply with its own reasonable policies and procedures designed to detect, prevent, and mitigate the risk of identity theft, which shall be consistent with and no less stringent than those required under the Red Flags Rule or the policies and procedures of CE's Red Flags Program. BA shall provide its services pursuant to the Contract in accordance with such policies and procedures. BA shall report any detected "red flags," as that term is defined in the Red Flags Rule, to CE and shall, in cooperation with CE, take appropriate steps to prevent or mitigate identity theft.

*[Remainder of page intentionally left blank]*

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum as of the Addendum Effective Date.

**COVERED ENTITY**
Success Healthcare 1, LLC
dba Silver Lake Medical Center

By: _____
Name: Steve Popkin, CEO
Date:

**BUSINESS ASSOCIATE**
Surgical Program Development, LLC

By: _____
Name: Brendan Bakir, CEO
Date:

10797003                                    7                    *Initials: Hospital* ___ *Company* ___

# EXHIBIT 2



FINAL
JUN RECD
2013

## FIRST AMENDMENT

## TO COLLECTIONS AND MANAGEMENT SERVICES AGREEMENT

THIS FIRST AMENDMENT TO COLLECTIONS AND MANAGEMENT SERVICES AGREEMENT (this "Amendment") is entered into by and between Surgical Program Development, LLC, a California limited liability company, ("Company") and Success Healthcare 1, LLC, a California limited liability company dba Silver Lake Medical Center ("Hospital"). Any capitalized terms used herein but not defined herein shall have the meaning set forth in the Agreement, as defined below.

### RECITALS

A. . . Company and Hospital have previously entered into that certain Collections and Management Services Agreement, effective June 1; 2010 (the "Agreement"), under which Company provides collection and other services to Hospital.

B. Company and Hospital now desire to amend the Agreement as set forth below.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the Company and Hospital hereby agree as follows:

1. Sections 1.7 to 1.10 are added to the Agreement to read as follows:

"1.7 **Physician Services.** Notwithstanding Subsection 1.1 of this Agreement, Company will provide Collection Services for Hospital with respect to all Claims for inpatient services and related supplies arising from surgical procedures performed by the physicians listed on Attachment C, which is attached hereto and incorporated by reference herein. From time to time, Company and hospital may agree to amend Attachment C. Company shall be the exclusive provider of Collections Services with respect to all Claims for inpatient services and related supplies arising from surgical procedures performed by the physicians listed on Attachment C, as amended from time to time."

"1.8 **Certain Management Services.** Company will provide Hospital with certain management services relating to the Hospital's spine surgery program. Such services include, but are not limited to, maintaining good relationships between the Hospital and the physicians

ENTERED

1097859.2

Silver Lake SLMCC — Surgical Program Dev (SPD) 1ST Amendment 1.03.13 Fin .0000 PDF

participating in the spine surgery program (the "Physicians"); facilitating the resolution of any issues that may arise between Hospital and any Physician; developing relationships with qualified physicians to participate in the spine surgery program with respect to patients not covered by federal health care program such as Medicare or Medi-Cal; facilitating the physician application process to become a member of the Hospital's medical staff; consulting and advising Hospital with regard to Payer plans; arranging for the pre-qualification of patients and the pre-authorization of surgeries; and providing other advice and recommendations concerning the conduct of the Hospital's spine surgery program.

"1.9    Federal Health Care Programs Excluded; Prohibited Referrals.  Company has not recommended to and arranged for, and shall not during the term of this Agreement recommend to, or arrange for, any physicians to furnish services covered under any federal health care program at Hospital, including without limitation Medicare or Medi-Cal, and the compensation set forth under this Agreement is not intended as an inducement for, or in return for, the referral of patients or recommending or arranging for the provision of services covered by a federal health care program at Hospital. The term "Claims" as used under this Agreement excludes any Claims reimbursable under a federal health care program. Company has not made and shall not make any referrals of any patients to Hospital.

1.10    Claims Exclude Federal Health Care Programs. The term Claims as used in this Agreement does not include any claims that may be reimbursed in whole or in part by a federal health care program, including without limitation, Medicare or Medi-Cal, and Company has not and shall not perform any Collection Services with respect to any such claims.

2.    Except as provided above, all other terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS THEREOF, this Amendment is entered into.

Surgical Program Development Company,
LLC ("Company")

Brendan Bakir, Chief Executive Officer

Success Healthcare 1, LLC, dba Silverlake
Medical Center ("Hospital")

Brent Cope, Chief Executive Officer

1097899.2                          3

# EXHIBIT 3

checks: Spine Program

| Checks Recvd | Date Received | Check given to Brendan & cashed by Brendan (Payable to SLMC) | Checks given to Brendan & returned thru check swap (Payable to Success) | Checks given to Brendan & not returned by Brendan (Payable to Success) |
|---|---|---|---|---|
| $  1,911,333.12 | | $   1,593,746.08 | $    245,181.94 | $    72,108.10 |
| $     139,471.70 | 12/14/16 | $     139,471.70 | $            - | - |
| $         3,240.00 | 12/14/16 | $         3,240.00 | $            - | - |
| $       53,185.98 | 12/01/16 | $       53,185.98 | $            - | - |
| $       57,877.91 | 12/06/16 | $       57,877.91 | $            - | - |
| $       52,633.95 | 12/12/16 | $       52,633.95 | $            - | - |
| $         3,240.00 | 12/14/16 | $         3,240.00 | $            - | - |
| $       43,774.63 | 12/27/16 | $            - | $       43,774.63 | - |
| $       27,014.17 | 12/27/16 | $       27,017.17 | $            - | - |
| $       14,161.69 | 12/27/16 | $       14,161.69 | $            - | - |
| $       27,014.17 | 12/27/16 | $       27,014.17 | $            - | - |
| $       38,499.10 | 12/29/16 | $            - | $       38,499.10 | - |
| $       12,141.79 | 01/04/17 | $            - | $       12,141.79 | - |
| $             72.09 | 01/04/17 | $             72.09 | $            - | - |
| $         1,695.69 | 01/11/17 | $         1,695.69 | $            - | - |
| $         3,280.43 | 01/30/17 | $            - | $         3,280.43 | - |
| $         8,358.00 | 01/00/00 | $            - | $         8,358.00 | - |
| $         6,965.00 | 01/18/17 | $            - | $         6,965.00 | - |
| $       24,852.38 | 01/18/17 | $            - | $       24,852.38 | - |
| $       21,129.91 | 01/18/17 | $       21,129.91 | $            - | - |
| $       10,314.49 | 01/00/00 | $            - | $       10,314.49 | - |
| $       82,076.47 | 01/00/00 | $       82,076.47 | $            - | - |
| $       27,585.88 | 02/10/17 | $       27,285.88 | $            - | - |
| $       23,477.68 | 01/00/00 | $       23,477.68 | $            - | - |
| $       34,885.35 | 02/21/17 | $       34,885.35 | $            - | - |
| $       79,846.98 | 02/21/17 | $       79,846.98 | $            - | - |
| $       14,088.20 | 02/21/17 | $       14,088.20 | $            - | - |
| $       22,270.40 | 02/28/17 | $       22,270.40 | $            - | - |
| $       38,761.50 | 03/02/17 | $       38,761.50 | $            - | - |
| $       13,655.29 | 03/15/17 | $       13,655.29 | $            - | - |
| $       12,138.03 | 03/20/17 | $            - | $       12,138.03 | - |
| $       15,653.55 | 03/20/17 | $       15,653.55 | $            - | - |
| $       15,172.54 | 03/29/17 | $       15,172.54 | $            - | - |
| $       13,655.29 | 04/13/17 | $       13,655.29 | $            - | - |
| $       12,464.04 | 04/17/17 | $       12,464.04 | $            - | - |
| $       44,203.50 | 04/18/17 | $       44,203.50 | $            - | - |
| $       18,215.91 | 04/24/17 | $            - | $       18,215.91 | - |
| $       24,430.90 | 05/01/17 | $            - | $       24,430.90 | - |
| $       64,543.13 | 05/01/17 | $       64,543.13 | $            - | - |
| $       62,865.02 | 05/03/17 | $       62,865.02 | $            - | - |
| $       47,370.56 | 05/22/17 | $       47,370.56 | $            - | - |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| $ | 78,136.61 | 06/01/17 | $ | 78,136.61 | $ | - | | - |
| $ | 20,995.14 | 06/02/17 | $ | - | $ | 20,995.14 | | - |
| $ | 21,216.14 | 06/07/17 | $ | - | $ | 21,216.14 | | - |
| $ | 25,448.85 | 06/14/17 | $ | - | $ | - | $ | 25,448.85 |
| $ | 25,475.69 | 06/21/17 | $ | 25,475.69 | $ | - | | - |
| $ | 46,659.25 | 06/28/17 | | | $ | - | $ | 46,659.25 |
| $ | 49,115.00 | 07/05/17 | $ | 49,115.00 | $ | - | | - |
| $ | 94,981.65 | 07/05/17 | $ | 94,981.65 | $ | - | | - |
| $ | 13,655.29 | 07/12/17 | $ | 13,655.29 | $ | - | | - |
| $ | 33,017.33 | 07/12/17 | $ | 33,017.33 | $ | - | | - |
| $ | 15,172.54 | 07/13/17 | $ | 15,172.54 | $ | - | | - |
| $ | 46,659.24 | 07/13/17 | $ | 46,659.24 | $ | - | | - |
| $ | 99,980.68 | 07/17/17 | $ | 99,980.68 | $ | - | | - |
| $ | 44,551.86 | 07/28/17 | $ | 44,551.86 | $ | - | | - |
| $ | 79,984.55 | 08/02/17 | $ | 79,984.55 | $ | - | | - |

# EXHIBIT 4

# CitiDirect Check Image Delivery



- Print    Close Window
- Check Image Inquiry Results

| Account # | Check # | Amount | Paid Date | Sequence # |
|-----------|---------|--------|-----------|------------|
|           |         | $46,659.25 | 10/11/2017 |         |







Citigroup.com                                              Terms of Use  Privacy

Copyright © 2003 -2017 Citigroup Inc.

# CitiDirect Check Image Delivery



○ **Print    Close Window**
○ **Check Image Inquiry Results**



| Account # | Check # | Amount | Paid Date | Sequence # |
|---|---|---|---|---|
|  |  | $46,659.25 | 10/11/2017 |  |

# CitiDirect Check Image Delivery



○ **Print**    **Close Window**
○ **Check Image Inquiry Results**

| Account # | Check # | Amount | Paid Date | Sequence # |
|---|---|---|---|---|
| | | $46,659.25 | 10/11/2017 | |



# CitiDirect Check Image Delivery



○ **Print**    **Close Window**
○ **Check Image Inquiry Results**

| Account # | Check # | Amount | Paid Date | Sequence # |
|-----------|---------|--------|-----------|------------|
|           |         | $46,659.25 | 10/11/2017 |        |



# CitiDirect Check Image Delivery



○ **Print**    **Close Window**
○ **Check Image Inquiry Results**

| Account # | Check # | Amount | Paid Date | Sequence # |
|---|---|---|---|---|
| ███████ | ███████ | $47,370.56 | 05/25/2017 | ███████ |





Citigroup.com

Terms of Use Privacy

Copyright © 2003 -2017 Citigroup Inc.

# CitiDirect Check Image Delivery



○ **Print**    **Close Window**
○ **Check Image Inquiry Results**

| Account # | Check # | Amount | Paid Date | Sequence # |
|---|---|---|---|---|
| | | $21,129.91 | 03/07/2017 | |





Citigroup.com                                                    Terms of Use Privacy

Copyright © 2003 -2017 Citigroup Inc.



Amount: $82,076.47          Sequence Number: ▮▮▮▮

Account: ▮▮▮▮               Capture Date: 02/21/2017

Bank Number: ▮▮▮▮           Check Number: ▮▮▮▮

THIS DOCUMENT CONTAINS A RED TO BLUE BACKGROUND ON THE FACE - SEE REVERSE SIDE FOR OTHER SECURITY FEATURES

Bank of America    11-39/1210                    CHECK NO. ▮▮▮▮

DATE:        01/24/2017

* * * * * *$82,076.47                VOID AFTER 120 DAYS

EIGHTY TWO THOUSAND SEVENTY SIX DOLLARS AND 47/100 CENTS

Claim:     14788
Claimant:  MARK ALLAIRE                              $82,076.47

PAY
TO THE      SILVER LAKE MED CTR
ORDER OF:   1711 W. TEMPLE STREET
            LOS ANGELES, CA, 90026

CHECK HERE LACKS A WATERMARK CONTAINED IN THIS DOCUMENT. THE FACE AND BACK OF THIS DOCUMENT. CONTAINS A BED TO BLUE BACKGROUND INCLUDING A HEAT SENSITIVE ICON, THIS DOCUMENT CONTAINS ADDITIONAL SECURITY FEATURES CONTAINED IN THIS DOCUMENT.

500641112000COMERICA 02/16/2017 $121137522

Credit to the account of the within named payee COMERICA BANK

A TRUE AND CORRECT IN TOTAL IS DOCUMENT IS HELD TO A LIGHT

Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|------------|-----|-----|-----------|
| 02/21/2017 | | | | | | |
| 02/21/2017 | | | | | | |
| 02/21/2017 | | | | | | |



Check Number:

56-1544
441
3

Issue Date:   01/31/2017

$*******34,885.35

JPMorgan Chase Bank, N.A.
Columbus, OH 43085

Pay
THIRTY-FOUR THOUSAND EIGHT HUNDRED EIGHTY-FIVE DOLLARS AND 35/100

TO THE   SILVER LAKE MED CTR
ORDER   1711 WEST TEMPLE ST
OF      LOS ANGELES, CA 90026

Authorized Signature

11287603

L32024 CMA CA 03/04/2017 >121137522<

COMERICA BANK

# EXHIBIT 5

1  STEVEN M. GOLDSOBEL (State Bar No. 166405)
   KOMAL J. MEHTA (State Bar No. 265334)
2  LAW OFFICES OF STEVEN GOLDSOBEL,
   A PROFESSIONAL CORPORATION
3  1901 Avenue of the Stars, Suite 1750
   Los Angeles, CA 90067
4  Telephone: (310) 552-4848
   Facsimile: (310) 695-3860
5  Email: steve@sgoldsobel.com
          komal@sgoldsobel.com

6  Attorneys for Defendant and Cross Complainant
   SUCCESS HEALTHCARE 1, LLC
7  d/b/a MEDICAL CENTER, and Defendants
   PROMISE HEALTHCARE INC., JAMES
8  HOPWOOD AND GEORGE WATKINS

FILED
Superior Court of California
County of Los Angeles

MAR - 2 2018

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
        Nancy Alvarez

9
10          SUPERIOR COURT OF THE STATE OF CALIFORNIA
11          COUNTY OF LOS ANGELES - CENTRAL DISTRICT

| | |
|---|---|
| 12  SURGICAL PROGRAM DEVELOPMENT, LLC, a California Limited Liability Company | ) Case No. BC673656 <br> ) [Assigned for All Purposes to <br> ) Hon. Robert J. Hess, Dept. 24] |
| 13 | ) |
| 14      Plaintiff, | ) |
|     v. | ) |
| 15  SUCCESS HEALTHCARE 1, LLC, a California | ) **CROSS COMPLAINT BY SUCCESS** |
| 16  Limited Liability Company dba  MEDICAL CENTER; PROMISE HEALTHCARE INC., a | ) **HEALTHCARE 1, LLC, d/b/a SILVER** <br> ) **LAKE MEDICAL CENTER** |
| 17  Florida Corporation; JAMES HOPWOOD, an individual; DAVID ARMSTRONG, an | ) |
| 18  individual; BRENT COPE, an individual; GEORGE WATKINS, an individual and DOES | ) Complaint Filed:  August 24, 2017 |
| 19  1 through 100, inclusive, | ) |
| 20      Defendants. | ) |
| 21 | ) |
| 22  SUCCESS HEALTHCARE 1, LLC, d/b/a Silver Lake Medical Center | ) |
| 23 | ) |
| 24      Cross-Complainant, | ) |
|     v. | ) |
| 25  SURGICAL PROGRAM DEVELOPMENT, | ) |
| 26  LLC, a California Limited Liability Company | ) |
| 27      Cross-Defendant. | ) |
| 28 | ) |

**DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL CENTER'S CROSS COMPLAINT**

1      Defendant and Cross Complainant Success Healthcare 1, LLC d/b/a Silver Lake Medical

2  Center ("SLMC"), by and through its attorneys of record, by way of its cross complaint against

3  Cross Defendant and Plaintiff Surgical Program Development, LLC ("SPD") hereby alleges as

4  follows:

5                     **THE PARTIES**

6      1.     Defendant and Cross Complainant SLMC is and was, at all times material hereto,

7  a limited liability company organized under the laws of the State of California with its principal

8  place of business in Los Angeles County, California.  SLMC is a general acute care hospital

9  located in Los Angeles, California.

10      2.     On information and belief, Plaintiff and Cross Defendant SPD is and was, at all

11  times material hereto, a limited liability company organized under the laws of the State of

12  California with its principal place of business in Los Angeles County, California.  On further

13  information and belief, SPD has held itself out to have expertise in managing surgical programs

14  with hospitals and other surgical facilities.

15               **COMMON ALLEGATIONS**

16      3.     SPD and its principal Brendan Bakir ("Bakir") promote themselves as industry

17  leaders with expertise in management of and collection for surgical programs within hospitals

18  such as SLMC.  SPD and Bakir also represent that they are knowledgeable regarding building

19  legally compliant and profitable surgical specialty programs.

20      4.     On or about June 1, 2010, SPD and SLMC entered into a Collections and

21  Management Services Agreement (the "Agreement").

22      5.     Pursuant to the Agreement, SPD agreed to provide timely and cost-effective

23  collection services for certain surgical procedures billed by SLMC to "private insurance payers,

24  Workers' funds or payers, and/or personal injury liens" ("Payers").  These procedures in large

25  part were spine-related procedures and often involved the implant of expensive hardware.  SPD

26  also agreed to assist SLMC in initiating, building, and managing a substantial and sustainable

27  orthopedic surgical program.

28

**DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL
CENTER'S CROSS COMPLAINT**

6.    SPD and SLMC subsequently amended the scope of the Agreement to include additional collection and management services.  The First Amendment did not amend any existing provisions to the Agreement.  Specifically, the terms regarding payment and collection were unchanged.

7.    Pursuant to the Agreement, SPD was to receive compensation based on amounts paid to SLMC by Payers.  SPD was required under the Agreement to pay hardware vendors for their costs.

8.    In or about June 2013, the Agreement was amended for a second time.  The Second Amendment dealt solely with compensation to SPD.

9.    SPD, however, did not adhere to the terms set forth in the Agreement.  Instead, SPD constantly and aggressively would monitor SLMC's collection of payments for surgeries which were assigned to SPD for collection or for which SPD believed it was entitled to payment.  In fact, SLMC later learned that SPD was paying one of SLMC's employees to share "real time" data with SPD regarding the details of SLMC's receipt of payments and Explanations of Benefits.

10.    In recent years, when SLMC received a check for payment for which SPD was entitled compensation, SPD would retrieve the check from SLMC.  SPD represented to SLMC that it would retain the checks until it prepared a calculation at month's end of what was owed to SPD and then would return the accumulated checks to SLMC in exchange for payment to SPD.  At first, SPD followed through on its promise and returned all of SLMC's checks.

11.    Later, however, SPD began to retain the checks that it had retrieved from SLMC and refused to turn them over at the end of each month.  When pressed for the payments, SPD falsely claimed that it did not need to pay SLMC its portion of the payments for 180 days from the date of payment to SLMC.  SPD thereafter collected – but failed to turn over – SLMC's payments for the period December 2016 through early August 2017.  These checks total more than $1.7 million.

12.    The Agreement did not require SLMC to turn over checks to SPD.  Section 3.6 of the Agreement, which has never been amended, clearly states that "[a]ll payments by Payers or

**DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL CENTER'S CROSS COMPLAINT**

1 others with respect to a Referred Case are to be made payable solely to 'Success Healthcare 1,

2 LLC' or as Hospital may otherwise direct in writing and are to be delivered to Hospital directly,

3 not to Company.  All settlements and orders for payment of Claims must reflect that payment

4 shall be made solely to 'Success Healthcare 1, LLC' or as Hospital may otherwise direct in

5 writing and are to be delivered to Hospital directly."  SPD had no contractual right to take

6 possession of the checks.

7       13.    It was only through pressure and harassment that SPD succeeded in convincing

8 SLMC to turn over checks to SPD rather than depositing them directly into SLMC's bank

9 account.  As a result of SPD's refusal to return to SLMC its checks, a balance owing to SLMC

10 quickly grew and is now approximately $1.8 million.

11       14.    SPD also stopped managing and paying hardware vendors.  Due to SPD's refusal

12 to carry out the terms of the Agreement, SLMC was forced to negotiate with and pay hardware

13 vendors, further increasing SLMC's damages as a result of SPD's breach of contract.

14       15.    SPD managed to continue to obtain checks from SLMC while SLMC attempted to

15 obtain an agreement from SPD to turn over its funds.  On or about July 19, 2017, after nearly a

16 year of attempting to negotiate repayment of SPD's growing debt, SLMC sent a Notice to Cure

17 the Agreement and again demanded payment.  SPD did not cure and has continued to retain

18 SLMC's funds paid to SLMC by Payers for healthcare services rendered by SLMC.

19 <u>**FIRST CAUSE OF ACTION**</u>

20 **(Breach of Contract)**

21       16.    SLMC hereby realleges and incorporates by reference paragraphs 1 through 15

22 above as if fully set forth herein.

23       17.    SLMC and SPD entered into the Agreement.  The Agreement detailed the

24 compensation to be paid to SPD for various collection and management services. During the

25 relevant time period, SPD would receive 60% of the amount paid to SLMC but would be liable

26 for the hardware in those surgical cases where hardware was used.

27       18.    SLMC performed or was prevented by SPD from performing all of the

28 requirements set forth in the Agreement that SLMC was required to perform.

- 3 -

**DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL CENTER'S CROSS COMPLAINT**

19. SPD materially breached the Agreement when it, among other breaches, failed to pay hardware vendors and refused to turn over funds owed to SLMC pursuant to the Agreement. Collectively and individually, these actions have materially breached the Agreement as a whole and deprived SLMC of its contractual rights and the consideration it was entitled to receive under the Agreement.

20. As a result of SPD's breach of the Agreement, SLMC has been damaged in excess of this Court's jurisdictional limit.

## SECOND CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

21. SLMC hereby realleges and incorporates by reference paragraphs 1 through 20 above as if fully set forth herein.

22. In every contract or agreement there is an implied promise of good faith and fair dealing. This means that each party will not do anything to unfairly interfere with the right of the other party to receive the benefits of the contract. SPD has engaged in a deliberate course of conduct to breach, undermine and frustrate the Agreement. This conduct evidences SPD's bad faith and breach the covenant of good faith and fair dealing.

23. SPD, among other acts, engaged in undisclosed dealings with physicians that were contrary state and federal law and interfered with SLMC's relationship with its employees. These actions, among others, were detrimental to the purpose and spirit of the Agreement, which was to assist SLMC with its surgical department and grow revenue in compliance with state and federal laws. Instead, SPD's malfeasance economically harmed SLMC and placed its compliance with state and federal laws in jeopardy.

24. On information and belief, SPD was fully aware that such actions could impact and were contrary to the terms of its contractual relationship with SLMC and the interests of SLMC.

25. SLMC has fulfilled, or was prepared to fulfill, all the requirements set forth in the Agreement.

26. SLMC has been damaged and is entitled to damages to be proven at trial.

- 4 -

**DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL CENTER'S CROSS COMPLAINT**

## THIRD CAUSE OF ACTION

### (Conversion)

27.    SLMC hereby realleges and incorporates by reference paragraphs 1 through 15 above as if fully set forth herein.

28.    In June 2010, SLMC and SPD entered into the Agreement, providing that SPD would, among other things, provide timely and cost-effective collection services for certain surgical procedures billed by SLMC to private insurance payers, Workers' funds or payers, and/or personal injury liens.

29.    These payments, totaling approximately $1.8 million normally would be sent to SLMC for deposit and accounting. SPD represented to SLMC that it would turn over the checks after it prepared a calculation at month's end of what was owed to SPD. SPD then would return the accumulated checks to SLMC in exchange for payment to SPD. SLMC is the rightful owner of the approximately $1.8 million entrusted to SPD's custody and care.

30.    SLMC has made multiple demands for SPD to turn over the checks and proceeds received from Payers for health care services rendered to patients of SLMC.

31.    However, SPD intentionally and substantially interfered with SPD's property by refusing to turn over the checks that it had retrieved from SLMC. When pressed for the payments, SPD claimed that it did not need to pay SLMC its portion of the payments for 180 days from the date of payment to SLMC. SPD thereafter collected approximately $1.8 million of SLMC's payments for the period December 2016 through early August 2017. SPD has completely failed and/or refused to account for SLMC's funds and has refused to return any of SLMC's funds.

32.    SLMC in no manner consented to SPD's misappropriation of SLMC funds.

33.    As a direct and proximate result of SPD's conversion of SLMC's monies, SLMC has been damaged in an amount to be determined at trial.

34.    As a result of SPD's intentional misconduct, recklessness, malice, and/or fraud alleged herein, SLMC is entitled to an award of punitive damages pursuant to *California Civil Code* § 3294.

- 5 -

**DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL CENTER'S CROSS COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FOURTH CAUSE OF ACTION

### (Accounting)

35.    SLMC hereby realleges and incorporates by reference paragraphs 1 through 34 above as if fully set forth herein.

36.    An agreement exists between SLMC and SPD wherein SLMC agreed to compensate SPD based upon a percentage of reimbursement received from private insurance payers, Workers' funds or payers, and/or personal injury liens.  SLMC entrusted SPD with said payments, trusting SPD to calculate the appropriate percentage owed.  This relationship allows for an appropriate claim for accounting to be made by SLMC.

37.    The Agreement requires, among other things, a duty to account for all revenue derived from Payers, as well as all expenses related to hardware.   Specifically, Section 1.3 of the Agreement states:

"Company [SPD] will keep and maintain for seven (7) years from the date of termination of Agreement, detailed books, records, and other documentation, whether in written or electronic form, pertaining to its Collection Services, including notes, logs, and correspondence pertaining to beneficiaries, services rendered by the Hospital [SLMC], and/or Payers against whom payment is sought by Hospital.  Such obligations survive termination of this Agreement.  Company shall promptly permit Hospital to access its records relating to the Collection Services upon request."

Further, Section 1.5 of the Agreement states:

"Company shall permit Hospital to audit, within a reasonable time of its request and during normal business hours, Company's reports submitted pursuant to the requirements of this Agreement.  Company shall cooperate with any compliance program established by the Hospital during the term hereof, including without limitation, giving Hospital and its representatives access to all claim records, data information, and software required by Hospital or Hospital's authorized agent who performs such audit.  Hospital may challenge any invoice submitted by Company within a reasonable time of receipt thereof."

- 6 -

DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL
CENTER'S CROSS COMPLAINT

1  These provisions of the Agreement never have been amended.

2       38.    SPD continues to fail and/or refuse to provide any such accounting to SLMC.

3       39.    As a result of the SPD's conduct, SPD has received money, a portion of which is

4  due to SLMC.

5       40.    The exact amount of money due from SPD to SLMC is unknown to SLMC  and

6  cannot be ascertained without an accounting of the aforementioned payments and expenses

7  relating to health care services rendered at SLMC which are subject to the Agreement, but SPD

8  has failed and refused, and continues to fail and refuse, to render such an accounting.

9                          **PRAYER FOR RELIEF**

10      WHEREFORE, Cross Complainant SLMC respectfully requests that this Court enter

11  judgment in its favor and against Cross Defendant SPD as follows:

12      1.     For compensatory and general damages;

13      2.     For costs of suit, including attorney's fees and costs;

14      3.     For pre- and post-judgment interest;

15      4.     For punitive damages; and

16      5.     For such further legal and equitable relief that this Court may deem just and

17             proper.

18

19                                    Respectfully submitted,

20  Dated: March 2, 2018             LAW OFFICES OF STEVEN GOLDSOBEL,
                                     A PROFESSIONAL CORPORATION
21

22

23  By: _____
                                     STEVEN M. GOLDSOBEL
24                                   KOMAL J. MEHTA
                                     Attorney for Cross Complainant and
25                                   Defendant Success Healthcare 1 LLC d/b/a
                                     Silver Lake Medical Center and Defendants
26                                   Promise Healthcare Inc., James Hopwood and
                                     George Watkins
27

28

                                    - 7 -

**DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL
CENTER'S CROSS COMPLAINT**

1

## DEMAND FOR JURY TRIAL

2    Cross Complainant hereby demands a jury trial.

3    Dated: March 2, 2018                     LAW OFFICES OF STEVEN GOLDSOBEL,
                                               A PROFESSIONAL CORPORATION
4

5                                              By: _____
6                                              STEVEN M. GOLDSOBEL
                                               KOMAL J. MEHTA
7                                              Attorney for Cross Complainant and
                                               Defendant Success Healthcare 1 LLC d/b/a
8                                              Silver Lake Medical Center and Defendants
                                               Promise Healthcare Inc., James Hopwood and
9                                              George Watkins

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 8 -
**DEFENDANT SUCCESS HEALTHCARE 1, LLC d/b/a SILVER LAKE MEDICAL
CENTER'S CROSS COMPLAINT**

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1901 Avenue of the Stars, Suite 1750, Los Angeles, CA 90067. On March 2, 2018, I served the foregoing document described as:

**CROSS COMPLAINT BY SUCCESS HEALTHCARE 1, LLC, d/b/a SILVER LAKE MEDICAL CENTER**

on the interested parties in this action by placing true copies thereof enclosed in a sealed envelope, addressed as follows:

Patrick Carreon
**THE CARREON FIRM**
444 W. Ocean Blvd., Suite 505
Long Beach, CA 90802
carreon@mocalaw.com

**[X]    BY MAIL:**

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U. S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presume invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on March 2, 2018, at Los Angeles, California.

_____
Samantha Carranza

PROOF OF SERVICE

1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

I am employed in the County of Los Angeles, State of California. I am over the age of
18 and not a party to the within action; my business address is 1901 Avenue of the Stars, Suite
1750, Los Angeles, CA 90067. On October 26, 2018, I served the foregoing document
described as:

4

5

6

**DECLARATION OF GEORGE WATKINS IN SUPPORT OF SUCCESS
HEALTHCARE 1, LLC'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR
RIGHT TO ATTACH ORDER**

7

8

on the interested parties in this action by placing true copies thereof enclosed in a sealed
envelope, addressed as follows:

9

10

Amin Al-Sarraf
**GLASER WEIL**
333 S. Hope Street, Suite 2610
Los Angeles, CA 90071
aalsarraf@glaserweil.com

11

12

13

14

**[X]  BY PERSONAL SERVICE** - I caused such envelope to be delivered by a process server
employed by First Legal.

15

16

I declare under penalty of perjury under the laws of the United States that the foregoing
is true and correct.

17

Executed on October 26, 2018, at Los Angeles, California.

18

19

20

Samantha Carranza

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

# Exhibit 61